UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph PRITCHETT,
Defendant-Appellant.

No. 81–5715.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 1, 1982.

Decided Feb. 4, 1983.

Warner Hodges, III, Memphis, Tenn. (argued), M.L. Alexander, Birmingham, Ala., for defendant-appellant.

W. Hickman Ewing, Jr., U.S. Atty., Timothy R. DiScenza, Katherine Carlyle (argued), Asst. U.S. Attys., Memphis, Tenn., for plaintiff-appellee.

Before LIVELY and MARTIN, Circuit Judges, and BROWN, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Joseph Pritchett, whose appeal is consolidated with that of his codefendant, Edwin Carper,[1] asks us to reverse jury convictions on one count of conspiring to distribute controlled substances, 21 U.S.C. § 846, for which he received a four-year sentence and six counts of aiding and abetting in possession with intent to distribute controlled substances, 21 U.S.C. § 841; 18 U.S.C. § 2, for which he received a four-year sentence on each count to be served concurrently with

1. We have affirmed Carper's conviction by or-   der dated December 9, 1982.

each other and with the sentence imposed for the first count. He also received three years parole.

Pritchett, his brother David, Carper, and others were indicted on the basis of information gathered during a six-month undercover investigation by the Memphis Police Department. The police, using paid informants and electronic surveillance equipment, monitored the activities of, and made controlled purchases of drugs from, various persons in the Memphis area.

Although the police never saw Pritchett buying or selling drugs, various witnesses implicated him as a drug supplier. Benny Eaves, a twice-convicted felon-turned-government informant testified that Pritchett had once offered to "front" him one quarter of an ounce of cocaine, that Pritchett and Carper had once sent him to purchase a set of scales (presumably to weigh drugs), and that Carper had told him that Pritchett was his (Carper's) supplier. In addition to Eaves' testimony, the prosecution introduced surveillance records revealing that Pritchett and his brother had been an occasional visitor to Carper's house.

Also admitted into evidence was the testimony of Howard McDaniel, a co-indictee and cooperating witness whose liability was limited in return for his cooperation. McDaniel testified that he had never seen nor heard of Joseph Pritchett. He also testified, however, that he had once given Carper a description of someone he had later learned was David Pritchett and that Carper had responded by saying "That's my man."

Pritchett moved for a separate trial. The motion was denied. In his defense, Pritchett claimed that he had never seen cocaine or quaaludes before meeting Carper and that, thereafter, any involvement he may have had with drugs was purely social. Moreover, he denied ever having bought drugs from, or sold drugs to, anyone, including Carper.

On appeal, Pritchett first asserts that the introduction of certain character evidence, and its verification by the trial judge, was prejudicial error. Second, he claims that

the evidence as a whole was insufficient to convict him. Third, he takes issue with limitations placed on his cross-examination of a certain key government witness.

We are not prepared to hold as a matter of law that, when viewed in a light most favorable to the government, the evidence against Pritchett fails to establish his guilt beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We are compelled to conclude, however, that either of the other two errors raised by Pritchett are of sufficient magnitude to merit reversal and a new trial. We consider each individually.

I

During cross-examination of Pritchett, the prosecutor inquired about a variety of telephone calls Pritchett had made to numbers in Memphis and Florida. Defense counsel objected. The prosecutor then indicated, out of the presence of the jury and in response to a query from the court, that she would ask "[i]f this is the telephone number of Lee Miles, who Lee Miles is, how much he knows about Lee Miles and if it is the same Lee Miles that was indicted over here for cocaine and the reason for the calls to Lee Miles, if necessary."

This was the first time, in the indictment, pretrial or trial, that the name Lee Miles had been mentioned. When the prosecutor reminded the judge that the court had indicted Miles a year earlier, the judge responded that the prosecutor could not "get into that" and would have to prove it in another way. The judge then instructed the prosecutor that she could ask Pritchett if he knew Miles and what he knew of Miles' background.

After Pritchett testified that he knew Miles, the following exchange took place:

Q. Is he the same Lee Miles that has been convicted of dealing in cocaine?

A. I don't know whether he was convicted or not.

Q. Well, did you know he dealt in cocaine?

A. I did not.

Q. You didn't know that?

A. No, ma'am.

Q. Let me ask you about all these calls to Florida.

[DEFENSE COUNSEL FOR CARPER]: Your Honor, I want to object. The only Lee Miles I know—I don't know about this conviction, but I know the one who was a cooperating individual.

THE COURT: Well, Mr. Friedman, I don't think the test is which ones of the dope dealers you know. He is the same one I sentenced, isn't he?

[PROSECUTOR]: Yes, your Honor.

Cross-examination proceeded without further objection through three additional questions. Then, referring again to the list of telephone calls, the prosecutor asked:

Q. There are an awful lot of telephone calls to Florida aren't there?

A. Yes, there are.

Q. Did you go down there and pick up some cars?

A. I have been there on several occasions and delivered cars to them and also Wauchula, Florida. A lot of them were going there and I also have an AMC jeep dealership there in Wauchula and there are several calls on here to that also.

Q. You are aware, aren't you, Mr. Pritchett, that a lot of cocaine is imported through Florida—

Defense counsel immediately objected and very shortly thereafter moved for a mistrial, both of which the court denied.

Pritchett's first objection is to what he characterizes as successful attempts by the prosecutor to introduce character evidence to prove that he acted in conformity therewith. Use of character evidence in this manner, he correctly points out, is prohibited by Fed.R.Evid. 404(b).

The prosecutor responds that her attempts to connect Pritchett with Miles were for the sole purpose of undermining Pritchett's credibility. She argues that in demonstrating that Pritchett was a close acquaintance of a cocaine dealer, she was merely rebutting his previous testimony that he knew nothing about drugs prior to meeting his codefendant, Carper.

■ Leaving aside for the moment the prosecutor's motive, we find the line of inquiry objectionable because it could be perceived as an attempt to establish guilt by association. The inference we fear here is that Pritchett, because he maintained a relationship with a convicted cocaine dealer, was himself somehow prone to criminal activity of the same sort. This is the kind of innuendo evidence which the courts, in various contexts, have warned against. *See, Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *United States v. Love,* 534 F.2d 87 (6th Cir.1976); *United States v. Shelton,* 628 F.2d 54 (D.C. Cir.1980).

In *Shelton,* the court held that it was prejudicial error for the prosecutor to cross-examine the defendant in a manner calculated to persuade the jury that he was a member of a drug underworld. It explained:

The evidence produced by the prosecutor's line of cross-examination is not rendered more acceptable by the fact that it is less focused and more subtly adduced than traditional "other crimes" evidence. Quite the contrary. Where the "other crime" alleged is not specified, it is more difficult for the defendant to refute the charge or to demonstrate its insignificance. Where the evidence is presented by innuendo, it is less likely that the jury will guard against manipulation. Therefore, the likelihood that a jury will draw on improper inference is even greater in a case like the one before us than it is in the traditional "other crimes" case.

628 F.2d at 57.

The prosecutor's response, that the inquiry was for impeachment purposes only, is unpersuasive. First, the only way by which the jury could conclude that Pritchett's credibility on the issue of drug knowledge had been impeached would be to draw precisely the sort of associational insinuations which we most fear. Otherwise, the fact that Pritchett was acquainted with an

individual who, among other things, had a criminal record for drug sales, is simply not probative on the issue of Pritchett's own knowledge of drugs. Even were we to conclude otherwise, we would still be left with the conviction that this evidence and the line of inquiry leading to it, should have been excluded because its potential for prejudice far exceeds its probative value. *See* Fed.R.Evid. 403.

Moreover, the prosecutor's final question in the portion of the transcript we have quoted above reveals an ulterior motive beyond the mere impeachment of Pritchett's prior testimony. Whether or not Pritchett knew that large quantities of drugs came into the country through Florida is so totally irrelevant to whether Pritchett supplied Carper with drugs that we can only conclude that the prosecutor was attempting to interject otherwise inadmissible evidence.

Despite our conviction that the prosecutor's cross-examination of Pritchett was improper, that fact alone would not justify reversal. Pritchett's innocent answers to the prosecutor's questions and the brevity of the exchange in the context of the lengthy trial mitigated its potentially damaging effect. What persuades us that a new trial is warranted here is what we can only characterize as improper testimony by the trial judge. The court, responding to an equally improper statement by Carper's defense counsel, confirmed what the prosecutor had unsuccessfully attempted to solicit from Pritchett—that Miles was in fact a convicted cocaine dealer.

In *United States v. Hickman,* 592 F.2d 931 (6th Cir.1979), Judge Keith underscored the risks attendant upon judicial intervention in the trial proceedings. "The problem," he wrote, "is that potential prejudice lurks behind every intrusion . . . The reason for this is that a trial judge's position before a jury is 'overpowering' . . . His position makes 'his slightest action of great weight with the jury.'" *Id.* at 933. By his interjection here, the judge below lent the weight of the bench to a line of inquiry we have already determined was impermissibly prejudicial. Moreover, because of the con-

text in which his editorial occurred—immediately following the defendant's negative answers—his remarks created a two-fold danger. Not only was the possibility that the jury would draw the prohibited inference strengthened, but there arose simultaneously the possibility that the jury would take the judge's confirmation as an impeachment of Pritchett's credibility. Whether or not either of the two possibilities actually come to fruition is impossible to say and, we think, irrelevant. We are persuaded that the risk is sufficiently great to justify reversal and remand for a new trial.

We should add that we recognize that the court's remarks were in response to equally prejudicial remarks by Carper's counsel. While we appreciate that in the heated atmosphere of the courtroom, an attorney's fervor may often overcome him, we see no excuse for what we perceive as testimonial interjection on the part of an attorney whose responsibility, moreover, lay with Pritchett's codefendant and not Pritchett. Nevertheless, we are still left with the conviction that the court's response created a sufficient risk of prejudice to necessitate action on our part.

## II

Although our resolution of the first issue alone calls for reversal and remand, the remedy might equally well have been premised on our resolution of the second issue raised by Pritchett. Specifically, we find the court's limitation of the scope of Pritchett's cross-examination of Eaves reversible error.

During the government's direct examination of Benny Eaves, the convicted felon-turned-government informant, the prosecutor asked Eaves whether he had ever sold ounces of cocaine to anyone other than Cyko, another suspect-turned informant. Eaves replied that he had and that the purchaser was a person named Mike Pruett. Moreover, he testified that he had gone to Pruett's house with Carper to make the transactions.

At the time of Pritchett's trial, Pruett was the subject of a separate investigation by the police. This fact emerged when, during cross-examination, the prosecutor objected to questions by defense counsel designed to elicit the names of other persons who may have been sources of supply for Eaves. In a bench conference beyond the hearing of the jury, the prosecutor informed the judge that Pruett was Eaves' other source. To permit defense counsel to bring out his name would, she argued, jeopardize the ongoing investigation of Pruett. Therefore, she asked that testimony on the subject be limited to the fact that Eaves had other sources without disclosing whom those sources were. The court, over the vehement protests of Pritchett's counsel that the defendant's cross-examination of Eaves was being "cut off at the base," agreed.

█ It is within the sound discretion of the trial judge to limit the scope of cross-examination. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1973); *United States v. LaRiche,* 549 F.2d 1088 (6th Cir.), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 383 (1977). That discretion is most often exercised to prevent repetitive or unduly harassing interrogation of a witness. *See Davis,* 415 U.S. at 316, 94 S.Ct. at 1110. A judge abuses his discretion, however, when he so limits cross-examination as to deny the defendant his sixth amendment right to confront the witnesses against him. *LaRiche,* 549 F.2d at 1096.

█ In this case, Pritchett was on trial for supplying drugs. The evidence against him, all circumstantial, was tenuous at best.

It primarily consisted of the testimony of Eaves, whose testimony throughout grand jury and trial proceedings on the Carper-Pritchett relationship was highly contradictory.[2] Pritchett's basic defense was that his was a purely social involvement with drugs. At no time, he asserted, did he ever supply Carper, Eaves, or anyone else with drugs. Therefore, a significant factor in the success of this defense would be his ability to demonstrate the existence of other sources of drug supply for the dealers, Carper and Eaves.

The government argues that Pritchett was permitted to, and did successfully, establish through Eaves that Eaves had other sources. In the context of this case, however, limiting Pritchett to the fact of another source without permitting establishment of whom that source actually was unnecessarily restricted a valid and perhaps potentially successful line of defense. This is because the other source was Mike Pruett, a name already known to the jury as a purchaser from Eaves and Carper. There was an established relationship between the three. It would have been far easier, we think, for the jury to accept the possibility that someone *other than Pritchett* was supplying the dealers when that third party is not only already known to the jurors but known in a context which ties directly into drug-related criminal activity.

Moreover, we are not persuaded by the government's argument that in-depth testimony would jeopardize an on-going investigation. First, direct examination of Eaves had already brought out Pruett's name in connection with illegal activities. Moreover, media coverage had apparently noti-

---

**2.** For example, a critical evidentiary point was whether Carper ever told Eaves that Pritchett was his supplier. On direct, the prosecutor asked Eaves:

> Q. *Did you subsequent to that time ask Mr. Carper if ... [Pritchet] ... was his supplier?*
> A. Yes ma'am.
> Q. And what was Mr. Carper's response?
> A. He said that ... [he] ... was.

A short time later on cross-examination, however, Eaves testified as follows:

> Q. And now, I needed [sic] to pin this down. Was it your surmise or your guess, or your

conclusion that Joe Pritchett was his [Carper's] source, or did he actually ever say that to you?
> A. I don't recall.

And again, during cross-examination:

> Q. Now, one time, I believe—oh, I believe you did testify under cross that you really had to make the assumption that he [Pritchett] was the supplier for Carper. Carper never actually said that, you made that assumption?
> A. Yes.

fied all who might be concerned, including Pruett, that Eaves was a cooperating witness. We find it difficult to believe that any damage that might have occurred to the government's surveillance operation had not, at that point, already occurred. In those circumstances, we cannot countenance shackling the defendants' fundamental right to confront and cross-examine the government's chief witness on subjects to which that witness had already testified.

Our decision here is supported by the Supreme Court's decision in *Davis*. There the government's chief witness against the defendant had a juvenile criminal record and was, at the time, on probation. State law prohibited use of a witness's juvenile record as evidence in a trial, however. Therefore, the defendant was prohibited from establishing that the witness might have been influenced by his probationary status into cooperating with the police in identifying the defendant. The Court reversed, holding that the right of confrontation was "paramount" to the state's policy of protecting juvenile offenders. It stated:

> The state could have protected . . . [the witness] . . . from exposure of his juvenile adjudication in these circumstances by refraining from using him to make out its case; the State cannot, consistent with the right of confrontation, require the petitioner to bear the full burden of vindicating the State's interest in the secrecy of juvenile records.

*Id.* 415 U.S. at 320, 94 S.Ct. at 1112. Nor may Tennessee, here, point to its interest in a separate criminal investigation as justification for abridgement of Pritchett's fundamental constitutional rights.

The conviction is reversed and the case remanded for a new trial.