884 F.2d 581
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph KALK, Defendant-Appellant,
Joseph KALK, Petitioner-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
 Nos. 88-3073, 89-3006.
 United States Court of Appeals, Sixth Circuit.
 Sept. 5, 1989.
 
 Before BOGGS and ALAN E. NORRIS, Circuit Judges, and THOMAS A. BALLANTINE, Jr., District Judge.*
 PER CURIAM.
 
 
 1
 Joseph Kalk appeals his conviction on two counts of making false statements to a bank in order to induce it to make a loan, in violation of 18 U.S.C. Sec. 1014. Kalk was sentenced to five years of probation, ten hours a week of community service during the probationary period, and a $10,000 fine. He also appeals the district court's denial of his motion to vacate his conviction or, in the alternative, for a new trial. We affirm the district court's decision in both appeals.
 
 
 2
 * Kalk's troubles arose out of his representation of Portable Air Supply Systems, Inc. (PASS), the Cleveland Community Savings Company ("the bank" or CCSC), and its wholly owned subsidiary, the Cleveland Community Ohio Development Corporation ("the corporation" or CCODC). Kalk was also a member of the bank's board of directors and served on its audit committee. All three of these entities were, in one way or another, controlled by Gerald S. Gilbert, a close friend of the defendant's. Gilbert was chairman of the bank and owner of PASS. He recommended that the corporation be formed in order to enable the bank to make commercial investments.
 
 
 3
 Gilbert, however, used the corporation as a cover for the bank's subsidizing of his other ventures. For example, the corporation's first transaction, in February 1981, was a $1.6 million loan to PASS. PASS almost immediately became delinquent on the loan, and Gilbert persuaded the bank to agree to accept only interest payments on the loan.
 
 
 4
 Federal and state bank regulators became concerned about the size and the delinquency of this loan. The bank's net worth, partly because of this loan, fell below legally required levels, causing the bank examiners to question the viability of the bank. In July 1982, the bank board, including the defendant, attended a meeting called by state and federal officials. The officials told the board that the bank was in deep financial trouble and that it would be insolvent within six months if it could not raise $400,000 in capital, as well as maintain an operating cushion of $200,000. The officials also asked the board to consent to search for another bank to merge with CCSC. Gilbert, in response to these demands, claimed that he could provide the necessary capital, and the board did not consent to the merger.
 
 
 5
 The financial condition of the bank continued to worsen. On August 20, 1982, the Ohio Superintendent for the Division of Savings and Loans, Clark Wideman, wrote a letter to the bank board stating that "Pursuant to authority granted to me ... I direct that Cleveland Community Savings and its subsidiary Development Corporation make no alteration in the loan to Portable Air Supply Systems, Inc., without my specific written approval obtained in advance." Kalk claims that he did not see this letter until January 1985, when it was showed to him by agents from the Federal Bureau of Investigation (FBI). On August 27, 1982, Wideman sent another letter to the board stating: "You are prohibited from granting any loan or extension of credit, or from making any commitment to make such loan or extension of credit without my prior written approval." Kalk acknowledged, in a letter dated August 30, that he received this letter and also stated that he would comply with its terms. Kalk never indicated that he did not think the Superintendent had the power to take this action or that he needed a clarification on the meaning of the order as it applied to deals already committed to or as to any other matter.
 
 
 6
 Before and while the Superintendent was imposing these restrictions on the bank, the defendant, along with Gilbert, was trying to obtain a $285,000 loan for PASS from the National City Bank (NCB), secured by certificates of deposit purchased by the bank through the corporation and pledged as collateral. Gilbert and Kalk also sought to obtain a $270,000 loan from Bank One of Akron (BOA), also to be secured by certificates of deposit purchased by the bank through the corporation.
 
 
 7
 On August 30, 1982, the very day he acknowledged receiving the letter from the state official, Kalk wrote the counsel of BOA, and told him that it was his opinion that no state or federal law prohibited the bank from guaranteeing the loan made by BOA to PASS. BOA's counsel wanted a more complete opinion letter from Kalk, so BOA drafted its own letter and sent it to Kalk for his review and signature. On September 10, 1982, the letter was sent out under Kalk's signature. The government alleges, and the jury found, that this letter contains several false statements. Those statements alleged to be false are:
 
 
 8
 (a) Community has the power to enter into the [refinanced] Pledge Agreement and pledge the [New] CD and to enter into and perform all of its duties and obligations under the Bank One Loan Documents, including the power to execute, deliver and fund the Community Loan pursuant to the Commitment, the Commitment Assignment and the bank assignment.
 
 
 9
 (b) The execution, delivery and performance of the Commitment, the Commitment Assignment, the Bank Assignment, and the [Refinanced] Pledge Agreement and the transactions and documents contemplated therein have been duly authorized by all requisite corporate action of Community and: (a) will not not violate any provision of the Articles of Incorporation or Codes of Regulations of Community in effect as of the date hereof; (b) any political subdivision, city, state, or federal law rule, regulation, or statute; or (c) any rule, regulation, policy or procedure of any government agency.
 
 
 10
 (c) No registration with, or consent or approval of, any governmental agency including the Federal Home Loan Bank Board, Federal Savings and Loan Insurance Corporation, and state financial institution agencies, and no consent or approval of any third party is required for the due execution and delivery of the Bank One Loan Documents, including the [Refinanced] Pledge Agreement and delivery of the [New] CD, or for the complete and timely performance of any of their terms by Community or for performance of its obligations under such documents.
 
 
 11
 (d) We have no knowledge of any action, suit, or proceeding at law or in equity or by or before any governmental instrumentality or other agency now pending or threatened against or affecting Community, Portable, or Gilbert which, if adversely determined, would or might materially impair the right of Community, Portable, or Gilbert to carry on their respective businesses substantially as now conducted or would or might have a material adverse affect on the financial condition of Community, Portable, or Gilbert.
 
 
 12
 (e) We have no knowledge that Community, Portable, or Gilbert is a party to any contract or agreement or subject to any restriction which materially and adversely affects their respective businesses, assets or financial condition.[1]
 
 
 13
 Kalk did not at any time during this transaction mention the restrictions put on the bank by the state regulatory authorities.
 
 
 14
 When this loan, which was only to be for 20 days, became delinquent, it became necessary to refinance. Another opinion letter was needed for the transaction. Kalk was sent another letter, along with supporting documents such as corporate minutes and resolutions. The government alleges that several of these documents were forged. For example, one set of corporate minutes recorded a meeting of the corporation board on August 20, 1982 in which the board approved the $270,000 loan. The minutes were purportedly signed by Cuthbert Cook, the secretary of the corporation. Cook testified that his signature was forged and that he never attended such a meeting. Other board members also testified that there was no such meeting. Kalk made no comment on the veracity of any of the documents and signed the second letter.
 
 
 15
 As to the NCB loan, on August 31, 1982, Kalk sent two letters to the NCB, one in his capacity as counsel for PASS and one as counsel for the corporation, concerning the loan transaction. Neither letter informed NCB of the recent restrictions on the bank's activities, and the corporation letter stated that "I find no provision in the Statutes or Regulations governing the conduct of Cleveland Community Development Corporation which would prohibit this transaction on their [sic] part." When he was interviewed by the FBI about these loans in January 1985, Kalk gave several versions of his story about the opinion letter, first stating that he did not recall the NCB loan, then stating that the letter was in error, and finally maintaining that Gilbert and the bank's president, Ray Bobo, had told him that the bank examiners had approved the loan. At trial, Kalk maintained, as he does in this appeal, that he relied on the word of Gilbert and others that the loans were legal.
 
 
 16
 On March 12, 1986, in an 18-count indictment naming four other defendants, Kalk was indicted for two counts of making false statements to BOA and NCB, in violation of 18 U.S.C. Sec. 1014. This indictment charged Kalk with making false statements in his opinion letters to the banks. These letters were false because, according to the indictment, Kalk knew that the state official "had imposed specific rules, regulations, and restrictions on the Cleveland Community Savings Company (CCSC) and on its wholly-owned subsidiary ... which prohibited CCSC and CCODC from engaging in such a transaction." The defendant moved to dismiss this indictment, arguing that no such rules existed. The motion was denied, as was a motion to reconsider the denial. Kalk also made a motion for a bill of particulars, requesting an accounting of the specific rules, regulations, and restrictions the defendant was alleged to have lied about. This motion was also denied.
 
 
 17
 On March 3, 1987, the day before his trial, the government moved to dismiss the indictment. In an ex parte hearing, the government convinced the judge to dismiss without prejudice. The government told the judge that it needed to clarify the indictment because it could be construed as having misstated the exact nature of the state official's restrictions on the entities represented by Kalk. In other words, Wideman's restrictions may not have been specific rules or regulations per se, even though the statements in the opinion letter were still false. The judge, citing a probable defect in the original indictment, granted the government's motion.
 
 
 18
 On March 24, 1987, the government reindicted Kalk alone, this time on a four count indictment. Two of the counts alleged that he made false statements to the BOA on both the original loan letters and the refinancing letters. The other two counts charged Kalk with aiding and abetting Gilbert and Bobo in their embezzlement. After the ex parte hearing and the submission of the new indictment, Kalk filed another motion for a bill of particulars, asking the government to specify which rules, regulations, statutes, policies, or procedures the defendant allegedly lied about. This motion was again denied. Kalk then moved to dismiss the indictment on the grounds of prosecutorial vindictiveness. This motion was also denied.
 
 
 19
 On June 16, 1987, after a jury trial, Kalk was found guilty on all counts. The defendant then moved for judgment notwithstanding the verdict. Judgment n.o.v. was granted to Kalk on the embezzlement counts but was denied on the false statement charges. The defendant then appealed.
 
 
 20
 After his appeal was filed, Kalk requested that the transcript of the March 3, 1987 ex parte hearing, parts of which were sealed by order of the trial court, be included in the record. The transcript was unsealed. After reviewing the transcript, Kalk moved to vacate the convictions or, in the alternative, for a new trial on the grounds of the non-disclosure of exculpatory evidence and prosecutorial vindictiveness. The motion was denied, and the defendant appealed. That appeal and the appeal of the verdict have been consolidated in this case.
 
 II
 
 21
 Kalk first argues that the court below erred in not allowing him to testify as to what other persons told him about the matters covered in the opinion letters at issue. Specifically, the trial court did not allow Kalk to testify that Gilbert and Bobo told him that there was a pre-existing commitment to go through with the BOA and NCB loans that was not affected by Wideman's actions. Kalk argues that the testimony would not be hearsay because he is not presenting Gilbert's or Bobo's statements to prove the truth of the matter asserted. He is presenting them to show that he believed in good faith that there was a pre-existing commitment and that he could honestly say in the opinion letters that he believed there was no legal impediment to the deal.
 
 
 22
 18 U.S.C. Sec. 1014 punishes "[w]hoever knowingly makes any false statement or report" for the purpose of influencing the action of any federally insured bank. This provision means that a defendant may be convicted of making a false statement only if the government proves beyond a reasonable doubt that the defendant either knew that the statement was false or acted with a conscious purpose to avoid learning the truth. U.S. v. West, 666 F.2d 16, 19 (2nd Cir.1981). A defendant's state of mind, including the belief that he was authorized to do what he did, is relevant to the question of whether he knowingly made false statements. Id. at 20.
 
 
 23
 Kalk argues that, by testifying as to what Gilbert and Bobo told him, he was attempting to demonstrate what he believed the truth to be, not what the truth really was. If Kalk could have proved that he acted in the good faith belief that he was disclosing true information, he could not have been convicted of knowingly making false statements.
 
 
 24
 Similarly, Kalk contends that the court erred in not allowing him to testify as to what BOA's attorneys told him concerning the signing of the opinion letters and the supporting documents. The government alleged at trial that the opinion letters falsely stated that the corporation was empowered by its board to take part in the loan transaction. The government argues that this contention is proved by the phony documents accompanying the letters. Kalk argues that he should able to testify as to what BOA's attorneys told him concerning the documents--which they prepared--in order to show that he did not know that those documents were forged and thus show that he did not knowingly make false statements. Kalk asserts that, after he voiced concerns about the propriety of the supporting documents, BOA's attorneys assured him that they were proper. The defendant argues that he should be able to testify to these statements to show his state of mind, not the truth of the matter asserted.
 
 
 25
 It is clear that Kalk is correct that his proffered testimony is not hearsay; he is not seeking to testify as to Bobo's and Gilbert's statements in order to prove the truth of their statements. Fed.R.Evid. 801(c). He is instead attempting to establish what his own state of mind was when he wrote the offending letters. It could be that Kalk is lying about what he was told to establish a non-existent state of mind. It is up to the prosecution to show why Kalk could never have believed his statements were true.
 
 
 26
 Based on our review of the record, however, we find that the defendant agreed to a compromise that allowed the admissions and led him, in effect, to waive his objection. This compromise occurred when Kalk attempted to testify as to what Bobo and Gilbert told him about the prior commitment to make the loans. The government objected and the following colloquy between the defendant's attorney and the court occurred:
 
 
 27
 MR. JULIANI: I think the evidence can get in as a result of conversations with either Gilbert or Bobo. He writes a letter to the bank, and that's the letter he was shown.
 
 
 28
 THE COURT: If he is going to say he wrote a letter, he will say he wrote a letter.
 
 
 29
 MR. JULIANI: As a result of the conversation.
 
 
 30
 THE COURT: As a result of what they said.
 
 
 31
 MR. JULIANI: Right.
 
 
 32
 THE COURT: Nothing wrong with that. Let's limit it that way, no conversations. If you want the conversations, bring them in.
 
 
 33
 The trial court then allowed Kalk to read a letter he had written to Bobo on August 30, 1982 stating that, based on Bobo's and Gilbert's statements to him that a commitment to complete the loans existed before Wideman imposed his restrictions, the corporation was required to complete the transaction. This testimony allowed Kalk to admit exactly the kind of evidence he claims he was denied from presenting. The defendant raised no further objections concerning this issue. Indeed, the government objected to the testimony concerning the letter, arguing that admitting this testimony was exactly the same as allowing Kalk to testify about the conversations with Bobo and Gilbert. The court overruled the objections.
 
 
 34
 This reliance on Bobo's representations was also stressed in Kalk's closing argument, as well as in his testimony concerning what he told the investigating F.B.I. agents. In addition, Kalk also was able to testify as to what BOA's attorneys told him. The government did make an objection and was sustained, but the jury heard the statement. (The government notes that the BOA attorneys testified for the government; they were not called by the defense.)
 
 
 35
 While it is clear that the defendant was incorrectly restricted in how much of this state of mind testimony he could present, we must ask, given what actually happened at trial, whether this error merits reversal. Rule 52(a) of the Federal Rules of Criminal Procedure states that "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." We hold that any error here, considering all the evidence, did not affect Kalk's substantial rights and, thus, was harmless.
 
 
 36
 The fact that Kalk was able to get in the most persuasive evidence including his own testimony that his clients told him there was a pre-existing commitment to make the loan, his letter to Bobo, as well as his testimony concerning BOA's attorneys, mitigates any harm he might have suffered. Any possible error on this score, in light of all the evidence, simply does not mandate reversal.
 
 III
 
 37
 Kalk next argues that the district court erred when it refused to give a requested jury instruction on good faith. Pointing to the West decision, the defendant contends that he was entitled to an instruction stating that he should be acquitted if he in good faith believed that the statements were true. The proposed instruction stated: "The Defendant Joseph Kalk, being an attorney, had a duty and right to interpret the August 27, 1982 letter [from Wideman]. It is not necessary that his interpretation was correct but only that he in good faith made that interpretation."
 
 
 38
 Courts must evaluate jury instructions in their entirety. U.S. v. Hamilton, 420 F.2d 1096, 1098 (7th Cir.1970). The defense counsel has the primary responsibility for making requests for jury instructions and requests that are fair and proper. U.S. v. Leach, 427 F.2d 1107, 1113 (1st Cir.1970).
 
 
 39
 The language in question was not offered as a separate instruction. It was instead offered in addition to another proposed instruction stating that "... under the Code of Professional Responsibility an attorney is obligated by law to resolve disputes in favor of his client." During oral argument on the instructions, the defendant's counsel stated that these proposed additions to the court's instructions go "hand in hand." It is our view that this instruction, considered in its entirety, would have misled the jury into thinking that good faith in this context means that an attorney has an obligation to make a good faith argument in favor of his client regardless of his actual belief. In this instance, good faith means that one must truly believe that one's statement is true. It has nothing to do with an obligation to a client. Indeed, here one must act against a client's interest if necessary. This instruction would, if accepted, have meant that the government must meet a higher standard of proof in such cases when the defendant is an attorney. The instruction, thus, was defective, and, since defendant offered no others, he has no cause for complaint.[2]
 
 IV
 
 40
 Kalk next contends that the court below erred in refusing to admit his profferred expert testimony, as well as his own testimony, on legal questions. Kalk argues that he and his experts would have been invaluable in determining, for example, whether or not Wideman's restrictions applied to pre-existing loan commitments. Kalk argues that without his or his experts' testimony on whether the decisions he made and the opinions he rendered were legally correct, he had no way to prove that the statements in the letters were not false. He was prosecuted, he argues, for submitting a false opinion; he should be allowed to show it is not false.
 
 
 41
 This case can, Kalk continues, be analogized to a malpractice case. The issue is whether Kalk's opinion was false; only an attorney can determine if it was false. The jury does not have the knowledge to determine this question. The trial judge did not give the jury any guidance in determining whether or not Wideman's letter prohibited the transactions at issue. He simply told the jury to attach to the letter whatever weight it wished.
 
 
 42
 We have previously held that testimony consisting of legal opinions on the applicable principles of law in a case is inadmissible. U.S. v. Zipkin, 729 F.2d 384, 387 (6th Cir.1984). In Zipkin, the court found, in a case where a bankruptcy receiver was accused of knowingly and fraudulently taking funds for his own use that belonged to the estate, that the district court erred in admitting the testimony of the bankruptcy judge that sat on the case. Ibid. The judge testified that under bankruptcy law the receiver had no right to interim fees, as the defendant claimed. Ibid. The court held: "It is the function of the trial judge to determine the law of the case. It is impermissible to delegate that function to a jury through the submission of testimony on controlling legal principles." Ibid.
 
 
 43
 We hold that this case is controlled by Zipkin. Kalk wants to present testimony on the controlling legal question of whether what he said was false. It is up to the trial judge to tell the jury what legal principles they need to know in order to decide if Kalk knowingly made a false statement. Here the judge told the jury that Wideman could propose and take action against a savings and loan, if it is given notice and an opportunity for a hearing. The jury would only be confused and misled by a witness advising them on the state official's authority.
 
 
 44
 It is also important to note that the defendant is wrong when he argues that he cannot present a defense if he cannot present testimony stating that the legal opinion was correct. What he needs to prove is that he believed his opinion was true and that he did not know that it was false. Even if the jury found that under the legal principles it was instructed on the opinion was false, the defendant could have still been acquitted.
 
 
 45
 Kalk attempts to distinguish Zipkin by stating that in that case the actual judge who sat on the case was a witness, making the situation more egregious. While it is true that the court in Zipkin did address that concern, it also held that legal opinion testimony could not be admitted in any event. The defendant also argues that the need for such testimony was more crucial here. This is not true. In fact, the issue in which the testimony was solicited in Zipkin is similar to the one here. Zipkin, an attorney, was attempting to argue that he did not knowingly take the estate's funds because he had a right to them as an interim fee. He could have argued that he needed to present his testimony and that of his experts on the legality of his actions, much as Kalk did here. Such testimony is appropriate in neither case.
 
 V
 
 46
 Kalk's fourth argument is that he was denied a fair trial because the prosecution attempted to undermine his credibility by bringing up irrelevant matters in a manner designed to prejudice the jury against the defendant. For example, Kalk argues, the government tried to turn the jury against him by asking him, on cross-examination, if he made a lot of money. Then, directly after this question, the prosecutor attempted to defame the defendant even further by asking him whether he represented the welfare and pension funds of Local 436 of the Teamsters Union, whose president, Sam Busacca, was at the time a defendant in what Kalk alleges was a highly publicized trial. Kalk alleges that the prosecutor was attempting to prejudice him by linking him with notorious criminal defendants. See U.S. v. Pritchett, 699 F.2d 317 (6th Cir.1983) (the court held that a prosecutor was prohibited from inquiring into the defendant's contact with drug dealers, calling it innuendo evidence).
 
 
 47
 The defendant also objects to the instruction the judge gave the jury after Kalk objected to this testimony. The judge instructed the jury that some questions are to inquire into the credibility of the witness, not simply for information. He told them: "We have what we call credibility. We may have some evidence from time to time questioning memory, inconsistent statements and things of that nature, and all that is for credibility." Kalk argues that this instruction was highly damaging to him because it suggested that the prosecutor's inquiry as to his income and his representation of the union local was highly relevant to credibility. This instruction gave credence to the prosecutor's attempt to create guilt by association. Kalk argues that this instruction also exemplifies the trial court's general prejudice against him. Kalk cites several instances in which the trial court testily told him to answer the questions asked, as well as one sidebar conference in which the judge asked the prosecutor if he was going to present rebuttal testimony. After the prosecutor said he might, the judge commented: "Then we will get the truth." Kalk says this shows the judge's prejudice against him. See U.S. v. Hickman, 592 F.2d 931 (6th Cir.1979) (court held that if trial court left the jury with the impression that it believed the defendant was guilty, jury could not be independent fact finder).
 
 
 48
 Kalk further contends that the prosecutor continued his campaign to show guilt by association when he asked the defendant if he was aware of his clients', Gilbert and Bobo, embezzlement of funds from the bank. These questions were meant to associate Kalk with the acts of his clients. Kalk also objects to the prosecutor's questioning him as to whether he asked the FBI agents if he was a target of the investigation, arguing that the government was trying to suggest that Kalk was attempting to invoke his fifth amendment rights. (The judge did, however, sustain an objection to this question; the defendant contends that the fact the question was asked contributed to the unfairness of his trial.)
 
 
 49
 Kalk's last complaint concerns the prosecution's questioning him about his eyesight. The prosecutor asked Kalk whether, when he was in court in an earlier session, he did see and make his own objections to court exhibits. Kalk argues that it is undisputed that due to childhood surgery he has no vision in one eye and only limited vision in the other. The prosecutor was attempting, Kalk believes, to convince the jury that Kalk was feigning a handicap to evoke their sympathy. The effect of this and the other prosecutorial and judicial misdeeds was to taint the trial as a whole.
 
 
 50
 We hold that these objections are groundless. The government inquired into the money and vision subjects because the defendant contended in his direct testimony and his opening statement that he had difficulty reading and seeing things and therefore had to rely on the word of his clients and also had to be meticulous when rendering opinions. The government, in its cross-examination, wished to show that the defendant saw well enough to build a lucrative law practice, in the process of which he billed clients for many hours of work. Among the highest paying of these clients was Local 436. The prosecutor only inquired as to the billings for the local; Busacca or any legal problems were not mentioned. We find it doubtful that the jury would have known the problems the union was facing.
 
 
 51
 The questioning about viewing the exhibit was proper because the defendant implied that he relied on what his clients told him because he had trouble reading documents. The government sought to show that the defendant could, in fact, read normal size documents, and Kalk did admit on cross-examination that he could read such documents. Given the defendant's instigation of this dispute, we do not see how he was treated unfairly.
 
 
 52
 As far as the court's comments are concerned, our perusal of the record convinces us that the defendant's arguments are baseless. The defendant did, at times, give self-serving non-responsive answers to direct questions. The judge had every right to admonish him.
 
 VI
 
 53
 Kalk's next objection is that the government did not present sufficient evidence to convict him of these charges. The defendant contends that the trial court erroneously instructed the jury that, in order to render a guilty verdict, it need find that only one of the five statements referred to in the indictment was false. Kalk argues that because the jury rendered a general verdict based on this instruction, the jury was required to find that all of the statements were false. Kalk contends that there was not sufficient evidence for a reasonable jury to find that all the statements were false.
 
 
 54
 A conviction must be upheld if, looking at the evidence in a light most favorable to the government, any rational trier of fact could have found guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). The main legal question concerning sufficiency of the evidence in this case involves whether the fact that the jury rendered a general guilty verdict on the false statement counts requires that all the statements be proven false. The defendant, citing U.S. v. Dota, 482 F.2d 1005, 1006 (10th Cir.1973), and U.S. v. Ryan, 828 F.2d 1010, 1015 (3rd Cir.1987), argues that each separate statement alleged to be false is a separate allegation and that it must be clear which allegation or allegations the jury agreed on. If it is not clear from the verdict which of the allegations the jury accepted, all the allegations must be found to be proper bases for the conviction or the case should be reversed. Ryan, 828 F.2d at 1015. In Ryan, for example, the defendant, who was also charged under Sec. 1014, was accused of making several false statements on a credit card application. (All of the allegations were contained in a single count.) The court ruled that, for the conviction to be upheld, every allegation had to be supported by sufficient evidence.
 
 
 55
 The government attempts to distinguish these cases by arguing that, in those cases, the statements were separate assertions. For example, in a credit card application, an applicant could lie about his job in one place and his bank balance in another. Here, the government contends, there is only one lie: the loan does not violate any governmental or corporate policy and can go through. The separate statements are all part of this one deception. We do not agree. In this regard, the opinion letter is just like the credit card application. A person applying for a credit card is submitting a statement assuring the bank that he is creditworthy; Kalk was doing that as well.
 
 
 56
 Thus, we must see if sufficient evidence supports a finding that each of the statements were false. Kalk focuses most of his attention on the second statement that the loan agreement has been authorized by the corporation and will not violate the articles of incorporation or the rules of the corporation, as well as "any political subdivision, city, state, or federal law, rule, regulation, or statute ... or .. any rule, regulation, policy, or procedure of any governmental agency."
 
 
 57
 Kalk argues that the government presented no evidence showing that this statement was false. He argues that the corporation had no specific rule requiring board authorization of loans, and thus it cannot be said that the action was unauthorized. He also contends that Wideman's letters did not apply to this transaction and, in any event, Wideman's pronouncements were not a statute, rule, or procedure.
 
 
 58
 We hold that the government presented sufficient evidence in order to prove that the statements were false. The corporation's articles of incorporation stated that the corporation was to be operated in accordance with state law. This was not done here. It is also clear to us that Wideman's letters expressed the policy of a state government agency. These letters were meant to stop the corporation from engaging in this transaction. (The same argument can be applied to the defendant's contention that the third statement, which states that no third party approval is necessary to make the loan, is true. The jury could have found that Wideman's second letter required that permission be obtained to engage in such transactions.)
 
 
 59
 It is our conclusion, then, that there is sufficient evidence for a reasonable jury to find that all the statements were false. The truth of the matter is that the statements do go together. Gilbert, Kalk, and the others in on the deal knew that they had no right to do what they did, but rather that they needed to cover their tracks.
 
 VII
 
 60
 The defendant's last argument is that the court below erred in denying his motion to vacate his conviction, or, in the alternative, for a new trial. Kalk alleges that the prosecution withheld exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83 (1963), and that the prosecution violated his rights under the fourteenth amendment of the Constitution by engaging in a vindictive prosecution.
 
 
 61
 Without making any comment as to the merit of these claims, we affirm the dismissal of the motion. Rule 33 of the Federal Rules of Criminal Procedure states that a motion for new trial based on newly discovered evidence can be filed within two years of a final judgment, but, if an appeal is pending, the trial court may grant the motion only if the case is remanded to it by the appeals court. A motion for new trial based on any other grounds must be filed within seven days of the verdict. The motion in question was made on November 16, 1988, more than a year after the verdict. This motion can, thus, only be one for a new trial based on newly discovered evidence. As there had been no remand of this question, we are bound to affirm the decision below. Based on the foregoing discussion, the conviction of the defendant is AFFIRMED.
 
 
 
 *
 The Honorable Thomas A. Ballantine, Jr., United States District Judge for the Western District of Kentucky, sitting by designation
 
 
 [1]
 The bracketed words were added to the second letter
 
 
 [2]
 In addition, the trial court instructed the jury on the necessity of finding that the defendant made the allegedly false statements with the knowledge that they were false. The court instructed that, under the statute: "A statement or report is false if untrue when made and then known to be untrue by the person making or causing it to be made." The court also instructed that "An act is done 'knowingly' if done voluntarily and intentionally, and not because of mistake, accident, carelessness, negligence or innocent reason." Thus, in these instructions, the defendant received the substance of the requested good faith instruction because had the jury believed that Kalk believed the statements made in the letters, it could not have convicted him of knowingly making false statements