960 F.2d 150
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dexter B. BATTLE, Defendant-Appellant.
 Nos. 90-6239, 90-6267.
 United States Court of Appeals, Sixth Circuit.
 April 17, 1992.
 
 Before RALPH B. GUY, Jr., NATHANIEL R. JONES and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Dexter Battle, convicted on four counts of possessing and distributing crack cocaine, seeks a new trial on the grounds that the prosecutor pursued a prejudicial line of inquiry and introduced an involuntary confession. Finding no error, we affirm.
 
 I.
 
 2
 Battle's conviction stemmed from a trip he and a companion, Ashley Scott, made to Johnson City, Tennessee, from their home town of Atlanta, Georgia. Despite his confession to the contrary, Battle contends on appeal that the trip was not undertaken for the purpose of selling crack and that he was in no way involved in drug distribution.
 
 
 3
 According to the government, Agent Rob Williams of a Johnson City-area drug task force learned from confidential informants that Battle and Scott were expected to arrive in Johnson City to sell crack at the Belmont Car Wash. The Belmont Avenue area is reputedly a crack district; drug agents had made several undercover buys in that region. Further information revealed that Battle and Scott would be driving a Ford GT Mustang with Georgia license plates and would stay at the Super 8 Motel.
 
 
 4
 When Battle and Scott arrived in the city, informants confirmed their presence and gave Agent Williams a complete physical description of the two men. Williams and another agent then set up a moving surveillance, observing Battle and Scott in front of the Black and Tan Club. The two suspects appeared to be engaging in hand-to-hand drug transactions from 9:30 p.m. until approximately 11 p.m.[1]
 
 
 5
 At around midnight, Agent Williams met with another investigator; the two then returned to the Belmont area to continue the surveillance. From approximately 1 a.m. to 3:30 a.m., they observed additional incidents of the suspects' apparent drug sales. When Battle and Scott then left the area and stopped at a convenience store, they were approached by Williams and other Johnson City police officers. Williams identified himself as a narcotics agent and said that he suspected the two of selling crack. Both Battle and Scott received Miranda warnings.
 
 
 6
 Williams looked into the Mustang and saw money on the seat and floor boards. He asked for permission to search the car; Battle consented. No drugs were found. Battle and Scott then gave permission for a search of their hotel room. Neither was handcuffed on the way to the hotel. Again, no drugs were found. Both then agreed to a strip search. A large amount of cash ($568) was found on Battle's person. Scott, however, was found to be carrying 23 baggies of crack. The two were then arrested and again advised of their rights. The officers allowed them to check out of their hotel room. No handcuffs were used for the trip to the police station.
 
 
 7
 Battle and Scott were then separately questioned. Miranda warnings were again given. Both signed a waiver form before giving a statement. Neither was handcuffed or physically restrained. In his statement, Scott said that he and Battle had brought from Atlanta between 40 and 50 rocks of cocaine, which they planned to sell in the Belmont area. Battle's statement included an account of the time they left Atlanta and the time they arrived in Johnson City. Battle also identified several Johnson City crack dealers and described some of his drug transactions that evening.[2]
 
 
 8
 After they had given and signed their statements, the two were told that if they agreed to cooperate in the agents' continuing investigation, they would be allowed to return to Georgia and their cooperation would be made known to the prosecutors. According to the plan, the two would be indicted later, and would be expected to return to Johnson City to assist in the investigation.
 
 
 9
 According to Battle's current version of the events, the two did indeed visit Johnson City and stay at the Super 8 Motel, but their trip to the car wash was solely to clean the Mustang, and his decision to remain outside the Black and Tan Club was simply due to his dislike of the establishment.
 
 
 10
 At the suppression hearing, Battle first claimed that Agent Williams had come up with the names of the crack dealers mentioned in his statement.[3] He then contradicted this claim by saying that he had concocted the whole story so that the police would let him return to Atlanta in time for his job. In what would later undermine his credibility at trial, Battle said that he had given the officers permission to search his car. The court refused to suppress the statement.
 
 
 11
 At trial, Battle denied that he had given permission for a vehicle search, claimed to have no knowledge of drugs or drug dealers, and stated that he did not make (or "concoct") the statement but only signed the statement the agents had prepared so that he could return to Atlanta. The jury convicted Battle on all four counts.
 
 II.
 
 12
 In his quest for a new trial, Battle first claims that the prosecutor pursued a prejudicial line of questioning in violation of Federal Rule of Evidence 403. We find that even if the questioning was improper, it constituted harmless error.
 
 
 13
 During direct examination by defense counsel, Battle denied any involvement in crack cocaine distribution or possession, even though he had admitted to such involvement and had identified area crack dealers in his statement. On cross-examination, the prosecutor asked Battle if he knew of a Johnson City crack dealer named "Honey" Jackson. Defense counsel objected, since Jackson's name was not mentioned in Battle's statement. The prosecutor responded that Battle "has set up here and told this jury he knows nothing about crack dealing." (App. at 2004). The court first sustained the objection, but allowed the questioning to continue after an off-the-record sidebar.
 
 
 14
 When questioning resumed, Battle said he had once met Honey Jackson, but did not know him to be a crack dealer. He further denied ever having conducted "any business" with Jackson. When Battle claimed that he had never sent crack to Jackson, the following exchange occurred:
 
 
 15
 Prosecutor: Mr. Battle, let me ask you to look at a Western Union Money Order there.
 
 
 16
 Court: Let him look at it and--
 
 
 17
 Prosecutor: And who does it show as receiving that $1,047?
 
 
 18
 Defense Counsel: Your honor, I object. He hasn't identified that or--
 
 
 19
 Court: Yeah, sustained.
 
 
 20
 ....
 
 
 21
 Prosecutor: Your honor, I think I still would be entitled to ask him about what's on it, and it's his name.
 
 
 22
 Court: It's not authenticated.... Unless he recognizes it, unless he'll say that he's familiar with that.... [w]e don't know the authenticity of it.
 
 
 23
 Defense counsel: [continued objection]
 
 
 24
 Court: Okay.... [A]ll right. Ask him. You see that document in front of you?
 
 
 25
 A: Yes, sir.
 
 
 26
 Court: Do you know what it is?
 
 
 27
 A: No, sir.
 
 
 28
 Prosecutor: Did you ever receive a thousand dollars from Honey Jackson by Western Union?
 
 
 29
 A: No, sir.
 
 
 30
 (App. at 206-07) (emphasis added). The Western Union document was not introduced into evidence and the prosecutor never mentioned it again.
 
 
 31
 Battle contends that the above dialogue impermissibly suggested his guilt by his association with a crack dealer. The government maintains that the Honey Jackson evidence both impeached Battle's credibility (since he had denied any familiarity with crack dealers) and was relevant substantively in suggesting that Battle did indeed engage in crack distribution, which he had also denied on direct.
 
 
 32
 Even if the foregoing excerpt amounted to "the kind of innuendo evidence which the courts, in various contexts, have warned against," United States v. Pritchett, 699 F.2d 317, 319 (6th Cir.1983),[4] we decline to award Battle a new trial on this basis. Several factors contribute to our conclusion that any prejudice was harmless under Chapman v. California, 386 U.S. 18, 25-26 (1967). The overwhelming proof of Battle's guilt included the agents' eyewitness testimony; Battle's statement, in which he confessed his involvement in selling crack on the night of his arrest and his familiarity with several Johnson City crack dealers; his contradiction at trial of his suppression-hearing testimony; and the prosecutor's immediately preceding inquiries about the other Johnson City crack dealers specifically mentioned in Battle's statement. Further, the court instructed the jury that counsel's statements are not evidence. Under these circumstances, the Honey Jackson line of questioning cannot be said to have "contribute[d] to [Battle's] conviction." Id. at 26.
 
 III.
 
 33
 Battle's claim that his confession was coerced is similarly meritless.
 
 
 34
 The test for voluntariness of a confession involves three factors. Threshold to the determination that a confession was "involuntary" for due process purposes is the requirement that the police "extorted [the confession] from the accused by means of coercive activity." Once it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the "coercion" in question was sufficient to overbear the will of the accused. Finally, petitioner must prove that his will was overborne because of the coercive police activity in question.
 
 
 35
 McCall v. Dutton, 863 F.2d 454, 459 (6th Cir.1988) (citations omitted; emphasis in original). The test recognizes psychological as well as physical coercion. Cooper v. Scroggy, 845 F.2d 1385, 1390 (6th Cir.1988).
 
 
 36
 As evidence of psychological coercion, Battle claims that he confessed to selling crack only because he had been interrogated--as he claims--for over three hours, and because the agents promised to let him get back to Atlanta for his job.[5] As he puts it, such promises "became so inviting that [he] felt compelled to sign." (Def's. Brief at 18). Such an alluring offer, however, does not rise to the level of cognizable coercion. In addition, the evidence revealed that Battle was interrogated for only one hour. The other two hours of his time in custody were spent in searching the car, hotel, and the suspects' clothing, and transporting the suspects from the convenience store to the hotel and then on to the police station. Further, the agents' promise that Battle and Scott could return to Atlanta if they agreed to assist in the investigation was made only after the two had signed their statements.
 
 
 37
 Finally, we note that Battle, a high school graduate with two years of college, was warned of his rights three times that night. The district court's finding as to Battle's intelligence--like the finding regarding the absence of any mistreatment--is not clearly erroneous.
 
 
 38
 The conviction is AFFIRMED.
 
 
 
 [1]
 According to Agent Williams, Battle and Scott were approached by several individuals; one or the other would then walk back to the Mustang and, after returning to the apparent customers, would hand them something. The individuals would then walk away
 
 
 [2]
 For example, Battle stated that, while at the car wash, he gave someone named Patrick "five bags to sell," and that Patrick later gave Battle "$71 that he made for selling the crack." (App. at 58-59). Battle also mentioned a specific sale of "a $25 rock" made to a customer outside the Black and Tan Club. (App. at 59)
 
 
 [3]
 The other details of the statement--including the exact times of departure and arrival--independently suggested the incredibility of Battle's claim that the agents fabricated the whole statement
 
 
 [4]
 In Pritchett, 699 F.2d at 319, a cross-examination probe into defendant's acquaintance with a convicted cocaine dealer--with defendant denying any knowledge of such conviction--was deemed unduly prejudicial as an "associational insinuation." The court concluded, however, that it was not enough, in itself, to warrant reversal. A new trial was required only because the prejudice was compounded by the trial judge's interjection that the dealer was "the same one I sentenced." Id. at 320, 319
 
 
 [5]
 Although Battle cites Cooper, 845 F.2d 1385 (6th Cir.1988), in support of his claim of coercion, he makes no claim that he was subjected to any of the physical violence inflicted upon the defendant in that case