Phillip **SPECTOR**, Petitioner,

v.

Ralph M. **DIAZ**, Respondent.

No. CV 12–5288–SJO (PLA)

United States District Court, C.D. California, Western Division.

Signed July 11, 2015

Charles M. Sevilla, Law Office of Charles Sevilla, San Diego, CA, Dennis P.

Riordan, Donald M. Horgan, Riordan and Horgan, San Francisco, CA, for Petitioner.

Lawrence M. Daniels, CAAG–Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ACCEPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, the other records on file herein, the magistrate judge's report and recommendation, and petitioner's objections to the report and recommendation. The Court has engaged in a *de novo* review of those portions of the report and recommendation to which objections have been made. The Court accepts the recommendations of the magistrate judge.

ACCORDINGLY, IT IS ORDERED:

1. The report and recommendation is accepted.

2. Judgment shall be entered consistent with this order.

3. The clerk shall serve this order and the judgment on all counsel or parties of record.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

### PAUL L. ABRAMS, United States Magistrate Judge

This Report and Recommendation is submitted to the Honorable S. James Otero, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California. For the reasons discussed below, the Magistrate

Judge recommends that the Petition for Writ of Habeas Corpus be dismissed with prejudice.

## I

## PROCEDURAL HISTORY

On September 20, 2004, petitioner was charged with murder, in violation of California Penal Code section 187(a). (Clerk's Transcript ["CT"] 1104). He was also alleged to have personally used a firearm within the meaning of California Penal Code sections 12022.5 and 12022.53. (*Id.* at 1105). He was tried by jury, but, on September 17, 2007, the jury declared that it was unable to reach a verdict. (*Id.* at 5416–17, 5513–14).

Petitioner was retried in 2008. (*See id.* at 5844). On April 13, 2009, after deliberating for nine days, the second jury found petitioner guilty of murder and found that he personally used a firearm. (*Id.* at 6457).[1] On May 29, 2009, the trial court sentenced him to state prison for a term of fifteen years to life for the murder, plus the middle term of four years for the firearm enhancement. (*Id.* at 6516–20).

Petitioner filed a direct appeal. (*See* Respondent's Notice of Lodging Nos. 6, 7, 9). On May 2, 2011, the California Court of Appeal affirmed petitioner's conviction in a published opinion. (Lodgment No. 10; *People v. Spector*, 194 Cal.App.4th 1335, 128 Cal.Rptr.3d 31 (2011)). Twice thereafter, the court of appeal modified its opinion, but did not change its judgment. (Lodgment Nos. 11, 13). Petitioner subsequently filed a petition for review in the California Supreme Court, which was summarily denied without citation to authority on August 17, 2011. (Lodgment Nos. 14–15). Petitioner then filed a petition for

---

1. Based on the Clerk's Transcript, it appears that the total amount of time that the second jury actually spent deliberating, excluding any and all delays, was approximately thirty hours. (CT 6421–33, 6458–59).

writ of certiorari in the United States Supreme Court, which was denied on February 21, 2012. (Lodgment Nos. 16–17).

On June 18, 2012, petitioner filed the instant federal Petition and supporting Memorandum of Points and Authorities ("Points & Auth."). (Docket Nos. 1, 2). On October 12, 2012, respondent filed an Answer and a supporting Memorandum of Points and Authorities ("Answer"). (Docket No. 13). Petitioner filed a response ("Reply") on November 9, 2012. (Docket No. 16).

This matter is deemed submitted and is ready for a decision.

## II

## STATEMENT OF FACTS

The facts underlying petitioner's conviction are set forth in the California Court of Appeal's published opinion affirming his conviction. (Lodgment No. 10 at 2–26). The court of appeal's statement of facts, summarized below, is reasonably supported by the record.[2]

On February 2, 2003, petitioner, a successful and highly influential record producer, met Lana Clarkson at the House of Blues in Hollywood. Prior to meeting Clarkson, petitioner had been drinking alcohol steadily for hours at various establishments. He arrived at the House of Blues near its 2:00 a.m. closing time. He was allowed entry into the club's exclusive Foundation Room. Clarkson, an actress who had worked in film and television for more than a decade, was working at the House of Blues as a hostess and as a security officer for the Foundation Room.

Petitioner, who was noticeably intoxicated, asked Clarkson to have a drink with him. After obtaining permission from her manager to do so, Clarkson agreed to sit with petitioner, but did not drink. The two talked, as petitioner continued to consume alcohol. When petitioner finished his last drink, he asked for more alcohol, but was refused another drink because the club was getting ready to close for the night.

As the club was closing, petitioner asked Clarkson if she needed a ride, and Clarkson replied that she did, in fact, need a ride. Petitioner then invited Clarkson to his home in Alhambra. Although Clarkson initially declined the offer, she eventually agreed to accompany petitioner to his home. As she entered petitioner's car, she told Adriano De Souza, petitioner's driver, that she was coming over only for a drink. They left the House of Blues parking area at approximately 2:20 a.m.

Petitioner and Clarkson arrived at his Alhambra home sometime around 3:00 a.m. They entered the home, while De Souza waited outside in the car, ready to take Clarkson home when she was ready to leave. Two hours later, De Souza heard a sharp noise. Shortly thereafter, petitioner opened the back door of his house and walked outside. De Souza, believing he was being summoned to take Clarkson home, approached petitioner and saw that petitioner was holding a revolver in his right hand. When he saw De Souza, petitioner declared, "I think I killed somebody." There was blood visible on petitioner's right index finger.

**2.** The Court "presume[s] that the state court's findings of fact are correct unless [p]etitioner rebuts that presumption with clear and convincing evidence." *Tilcock v. Budge,* 538 F.3d 1138, 1141 (9th Cir.2008) (citations omitted); 28 U.S.C. § 2254(e)(1). Because petitioner has not rebutted the presumption with respect to the underlying events, the Court relies on the state court's recitation of the facts. *Tilcock,* 538 F.3d at 1141. To the extent that an evaluation of petitioner's individual claims depends on an examination of the trial record, the Court herein has made an independent evaluation of the record specific to those claims.

De Souza peered into the house and saw Clarkson's slumped body and saw that there was blood on her face. When De Souza asked petitioner what had happened, petitioner shrugged his shoulders but he did not say anything. De Souza fled from the house and called the police to report what had happened and what petitioner had said when he exited his home.

When the police arrived in response to De Souza's call, they found Clarkson's body slumped in a chair near the back door of petitioner's house. Underneath one of Clarkson's legs, police found a revolver. Clarkson had been shot once. The bullet went through her neck and head, having first entered through her mouth. She and petitioner were the only two people inside the house when Clarkson was shot.

Petitioner subsequently was arrested and charged with murder. At trial, he sought to show that Clarkson was an emotionally unstable person who either intentionally or accidentally shot herself in petitioner's home. In an effort to support this defense theory, petitioner presented several scientific experts who essentially testified that the evidence of the blood spatter and blood transfer at the crime scene was consistent with a self-inflicted wound.[3] The defense also presented evidence to suggest that Clarkson was a frustrated actress, and introduced emails authored by Clarkson and lay testimony that, in the defense's view, suggested that she had contemplated suicide or was suicidal.

For its part, the prosecution presented its own scientific experts who essentially testified that the evidence of the blood spatter and blood transfer at the crime scene, as well as certain wounds on Clarkson, were consistent with a homicide, not a suicide. The prosecution also offered evidence to counter petitioner's theory that Clarkson was suicidal. In particular, the prosecution offered testimony showing that Clarkson had secured, and made plans to apply for, several modeling and acting jobs. Additionally, the prosecution presented other evidence of Clarkson's work, personal activities, and plans that, according to the prosecution's theory, were irreconcilable with a person bent on committing suicide.

In addition to numerous expert witnesses from both sides, the jury also heard testimony about petitioner's prior incidents involving his use of firearms against women. Specifically, five women who had either personal or work-related interactions with petitioner in the past each testified to having been threatened and held hostage by petitioner at gun point. In each such instance, petitioner had been drinking heavily. And, in several of the incidents to which the witnesses testified, petitioner, holding a gun, threatened to kill the women if they tried to leave.

### III

### *PETITIONER'S CONTENTIONS*

1. The trial judge deprived petitioner of his constitutional right to an impartial judge by allowing the prosecutor to introduce a videotape from petitioner's first trial containing testimonial statements by the trial judge. (Petition at 5).

2. The trial judge violated petitioner's Sixth Amendment right to confront the

---

3. According to one defense expert, blood transfer is caused by "blood on an object touching a nonbloody object and leaving some blood behind." In contrast, blood spatter consists of "bloodstains that have ... resulted from a force applied to a source of blood." As is relevant to the resolution of petitioner's claims, blood spatter would result from blood caused by the gunshot, whereas blood transfer could have been caused by simply coming into contact with the blood after the gunshot.

witnesses against him by allowing the prosecutor to introduce into evidence the trial judge's testimonial statements from petitioner's first trial. (Petition at 5).

3. The prosecutor deprived petitioner of his right to due process and a fair trial by arguing that the trial judge was a prosecution witness. (Petition at 6).

4. The prosecutor deprived petitioner of his right to due process and a fair trial by attacking defense counsel's integrity and arguing that petitioner used his wealth to purchase false testimony. (Petition at 5).

## IV

### *STANDARD OF REVIEW*

The Petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA"). Pub.L. No. 104–132, 110 Stat. 1214 (1996). Therefore, the Court applies the AEDPA in its review of this action. *See Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Under the AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As explained by the Supreme Court, section 2254(d)(1) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court."

*Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In *Williams,* the Court held that:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495; *see Weighall v. Middle,* 215 F.3d 1058, 1061–62 (9th Cir.2000) (discussing *Williams*). A federal court making the "unreasonable application" inquiry asks "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495; *Weighall,* 215 F.3d at 1062. The *Williams* Court explained that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams,* 529 U.S. at 411, 120 S.Ct. 1495; *accord: Lockyer v. Andrade,* 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Section 2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings," *Lindh,* 521 U.S. at 333 n. 7, 117 S.Ct. 2059, that "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti,* 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). A federal court may not "substitut[e] its own judgment for that of the state court, in contravention of 28

U.S.C. § 2254(d)." *Id.* at 25, 123 S.Ct. 357; *Early v. Packer*, 537 U.S. 3, 11, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam) (holding that habeas relief is not proper where state court decision was only "merely erroneous").

 The only definitive source of clearly established federal law under the AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412, 120 S.Ct. 1495. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law (*Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 1999)), only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *Williams*, 529 U.S. at 412, 120 S.Ct. 1495; *Moses v. Payne*, 555 F.3d 742, 759 (9th Cir.2009). Furthermore, under 28 U.S.C. § 2254(e)(1), factual determinations by a state court "shall be presumed to be correct" unless the petitioner rebuts the presumption "by clear and convincing evidence."

 A federal habeas court conducting an analysis under § 2254(d) "must determine what arguments or theories supported, or, [in the case of an unexplained denial on the merits], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Harrington v. Richter*, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."). In other words, to obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103, 131 S.Ct. 770.

The United States Supreme Court has held that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). Here, petitioner presented Grounds One, Two, and Four on appeal to the California Court of Appeal, which issued a reasoned opinion rejecting the claims set forth in those grounds for relief. (*See* Lodgment No. 10). Thereafter, the California Supreme Court summarily denied the claims. (*See* Lodgment No. 15). Accordingly, this Court reviews the California Court of Appeal's reasoned opinion rejecting petitioner's Grounds One, Two, and Four under AEDPA's deferential standard. *See Ylst*, 501 U.S. at 803, 111 S.Ct. 2590; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir.2000) (district court "look[s] through" unexplained California Supreme Court decision to the last reasoned decision as the basis for the state court's judgment).

As for petitioner's prosecutorial misconduct claim in Ground Three, respondent argues that the claim is procedurally barred because the California Court of Appeal cited petitioner's failure to assert the claim in his opening brief as a basis for rejecting it. (*See* Answer at 21–24 (citing Lodgment No. 13)). However, a review of the portion of the court of appeal's opinion to which respondent refers shows that only part of Ground Three could be procedurally barred—specifically, the part in which petitioner faults the prosecutor for display-

ing during closing arguments stills from a videotape depicting the trial judge. (*See* Lodgment No. 13). In discussing petitioner's allegations of the prosecutor's use of those stills, the court of appeal stated that petitioner had failed to properly raise that issue in his opening brief, and had not made the stills part of the record. (Lodgment No. 13). Consequently, the court of appeal declined to address petitioner's arguments as they related to the prosecutor's use of the stills from the videotape.

The court of appeal, however, made no mention of petitioner's argument that the prosecutor committed misconduct by arguing that the trial judge was a witness for the prosecution. This fact is not surprising because petitioner did not assert this argument on direct appeal. He did, however, assert it in his petition for review, and the California Supreme Court rejected it without comment. In California, a summary denial of a petition for review is not considered an adjudication on the merits. *Camper v. Workers' Comp. Appeals Bd.,* 3 Cal.4th 679, 679 n. 8, 12 Cal.Rptr.2d 101, 836 P.2d 888 (1992) ("[W]e reiterate the well-established rule in this state that a denial of a petition for review is not an expression of opinion of the [California] Supreme Court on the merits of the case."). Accordingly, the Court shall apply *de novo* review to this aspect of petitioner's third ground for relief. *See Cone v. Bell,* 556 U.S. 449, 472, 129 S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009); *Pirtle v. Morgan,* 313 F.3d 1160, 1167 (9th Cir.2002) (when there is no state court decision on the merits, habeas review is de novo). Moreover, in the interests of judicial economy, the Court elects to address petitioner's argument that the prosecutor committed misconduct in displaying the stills from the videotape during closing argument, rather than determining if that argument is procedurally barred. *See Lambrix v. Singletary,* 520 U.S. 518, 524–25, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (holding that,

in the interests of judicial economy, federal courts may address an allegedly defaulted habeas claim on the merits if the issue on the claim's merits is clear but the procedural default issues are not).

## V

### *DISCUSSION*

### GROUNDS ONE AND TWO: RIGHT TO AN IMPARTIAL JUDGE AND RIGHT TO CONFRONTATION

In Grounds One and Two, petitioner asserts two separate claims involving the trial judge's decision at petitioner's second trial to admit a portion of a videotape from an evidentiary hearing that was conducted during his first trial. The facts underlying both grounds are set forth in detail below. Briefly, however, the relevant facts are as follows: Jaime Lintemoot, a criminalist with the Los Angeles County Coroner's Office, testified in a videotaped evidentiary hearing during the first trial that she had seen blood spatter on Clarkson's wrist at the crime scene. During her testimony on this point, she pointed to her wrist to indicate where she had seen the blood spatter. The trial judge, who had the best view of Lintemoot's wrist and her gestures, stated on the record which part of her hand Lintemoot was pointing to when describing where she saw the blood spatter. After a brief exchange between the trial judge and the prosecutor regarding where Lintemoot had pointed, the trial judge asked Lintemoot to show the judge and counsel where on the victim's hand she had seen the blood spatter. In response, Lintemoot essentially confirmed the record that the trial judge had made.

The foregoing facts, according to petitioner, give rise to two separate constitutional violations. First, petitioner asserts that the videotape's admission contravened his due process right to an impartial judge

because it effectively rendered the court a witness for the prosecution. Specifically, petitioner complains that the judge testified regarding where and whether there was blood spatter on the victim's wrist. Moreover, petitioner maintains that the jurors naturally took the trial judge's statements in the videotape as true because of the court's unique and authoritative role in the trial.

Second, petitioner contends that the admission of the videotape violated his Sixth Amendment right to confrontation. According to petitioner, the videotape contained the trial judge's out-of-court statements that were offered for the truth of the matter asserted on a critical, contested factual matter. Consequently, petitioner reasons that the tape could not be admitted into evidence unless petitioner was afforded an opportunity to question the trial judge about his statements. Because he was not afforded the right to cross-examine the trial judge, petitioner contends that he was denied his right to confrontation.

The prejudicial impact of these purported constitutional errors, according to petitioner, was profound because the trial judge's statements established as a near scientific fact that Clarkson could not have fired the fatal shot, even though the actual witness testimony on that point was suspect. Petitioner, furthermore, contends that the trial judge compounded the prejudicial impact of these purported errors by subsequently allowing the prosecutor during closing argument to use stills depicting the trial judge in the video as evidence of petitioner's guilt. Additionally, petitioner faults the trial judge for failing to instruct the jury that the judge was not a witness.

As a result of the trial judge's purported errors, according to petitioner, the jury resolved the scientific evidence in favor of the State. In support of this argument, petitioner notes that his first trial resulted in a hung jury and that the jury in his second trial deliberated for nine days before reaching a verdict. Citing these two facts, petitioner asserts that the jury believed that this was a close case in terms of whether the prosecution met its burden to prove petitioner's guilt beyond a reasonable doubt. Furthermore, petitioner believes that the difference between the first trial—which resulted in a hung jury—and the second trial—which resulted in a guilty conviction—was the testimony pertaining to where Lintemoot saw the blood spatter. According to petitioner, the State's experts in the first trial could not determine with any degree of scientific certainty that someone other than Clarkson fired the fatal shot because they did not consider Lintemoot's testimony on that point. But in the second trial, one of the State's experts, relying on Lintemoot's testimony about where she saw the blood spatter, was able to opine that it was physically impossible for Clarkson to fire the fatal shot. Citing this difference in testimony between the two trials, petitioner concludes that Lintemoot's testimony was the key piece of evidence upon which the jury in the second trial relied in reaching its verdict. Believing that the trial judge's videotaped statements simultaneously bolstered Lintemoot's testimony and established where the blood spatter was located on Clarkson, petitioner asserts that the trial judge's purportedly erroneous decision to admit the videotape effectively caused the jury to find petitioner guilty.

### 1. The Court of Appeal's Resolution of Petitioner's Challenges to the Videotape

The court of appeal rejected both of these allegations of constitutional error on their respective merits. (Lodgment No. 25). In doing so, the court of appeal reasoned that, in the videotape, the trial judge did not act as a witness, but rather acted within his discretion to clarify Lintemoot's

testimony as to which part of her hands she had been pointing to as she was describing where she saw the blood spatter. (*See id.* at 31, 33). In support of its reasoning, the court of appeal noted that, immediately after making a record of Lintemoot's action, the trial judge asked Lintemoot to clarify where she had seen the blood. (*Id.* at 34). Turning to petitioner's Confrontation Clause claim, the court of appeal held that the trial judge's statements in the video could not have violated petitioner's right to confrontation because the statements were admitted for a non-hearsay purpose—namely, to give "context and meaning to Lintemoot's responses" pertaining to where she claimed to have seen the blood. (*Id.* at 34). As explained below, the court of appeal did not commit constitutional error in rejecting either of petitioner's claims.

## 2. Factual Background

### a. The Court of Appeal's Opinion

The California Court of Appeal set forth the relevant facts as follows:

> [T]he forensic evidence was fiercely contested, particularly the question whether bloodstains on Clarkson's hands proved she could or could not have shot herself.

> A key part of the prosecution's forensic case was the testimony of Lynne Herold, the Los Angeles County Sheriff's Department criminalist, who concluded Clarkson could not have fired the gun. Asked if the presence of "mist-like spatter or small pinprick spatter" on the back of Clarkson's hands and wrists would be inconsistent with Clarkson having held the gun in a firing position, Herold testified it was not only inconsistent, it was an impossibility. As Herold explained, "[B]lood, to get on that side due to being mist-like and associated with the gunshot, would have to fly around a corner to hit the target, and that doesn't happen." On cross-exami-

nation, Herold indicated she was relying on Jaime Lintemoot's testimony, at the retrial, regarding "blood staining on [Clarkson's] hands."

. . .

Lintemoot testified to the jury at the first trial about having observed bloodstains on Clarkson's hands at the crime scene. Lintemoot's handwritten notes, which she made at the scene, referred to blood spatter on the "outside" of Clarkson's wrists. FN7 Her subsequently-prepared typed report, FN8 however, stated only: "Small red stains were also observed on both of the decedent's hands and wrists." Crime scene photographs of Clarkson's hands, which had been taken at Lintemoot's direction but not by her, came out badly and were apparently of little use for confirming this aspect of Lintemoot's observations. At an evidentiary hearing held outside the jury's presence, the following colloquy occurred:

FN7. Lintemoot's contemporaneous notes said: "Right wrist—some small apparent blood spatter [sic] outside of wrist," and "Left Wrist . . . outside blood spatter."

FN8. The typed report is dated March 10, 2003.

> Prosecutor: What you believe to be mist-like spatters were on you indicated, if I am not mistaken, on her wrists?

> Lintemoot: On the outside of the decedent's wrists.

> Prosecutor: All right. Not on her hands per se?

> Lintemoot: Just in this area (indicating), two or three-inch radius around, around the wrists.

> The Court: I would say it's from—if you take where the wrist joint is, the two to three-inch radius would be in a

circle from that point. [¶] Would that be correct?

Prosecutor: The interior wrist, that portion of the wrist joint—

The Court: That's the exterior, isn't it? The interior would be this part, the exterior would be where she was pointing.

Prosecutor: Actually, I was making a differentiation between this part of the joint and that part of the joint.

The Court: Why don't you show us. That would be the best.

Lintemoot: Exterior. So the outside of the wrist area.

Prosecutor: Okay. The outside of the wrist.

Lintemoot: Yes.

As discussed ante, Lintemoot testified at the retrial about having seen mist-like bloodstains on the back of Clarkson's wrists. On cross-examination, defense counsel asked her: "And in both cases, with respect to both hands, the spots that you saw were on what you would now describe as the forward portion of my right hand, the forward portion of my left hand? [¶] A. Not the finger region. [¶] Q. Not [the] finger region, but . . . above the webbing of the thumb opposite the palm? [¶] A. Correct."

The prosecutor later recalled Lintemoot to the stand to clarify this exchange with defense counsel. Lintemoot testified: "The area that I saw the mist-like blood spatter was on the back of the decedent's wrist area, so the side opposite of the palm, and it was about a two- to three-inch radius around the joint here." The prosecutor clarified Lintemoot's demonstration for the record: "[Y]ou used your left hand to show the jury the backside, and you started at the joint of the wrist, and you made a motion, a circular motion of a two- to three-inch radius; is that correct?"

Lintemoot agreed it was. The prosecutor then asked:

Q. Okay. Now, it was brought to my attention, because I didn't see it, but I think what [defense counsel] had used, in demonstrating his hands, were what I would describe as the area around the web between the thumb and the index finger. [¶] Do you recall that?

A. He was pointing to that area.

Q. Is that correct?

A. That is not correct in that is where the blood spatter was. It was not on the fingers. It was not on the thumb. It was on the backside of the hand-wrist area.

Again cross-examining Lintemoot, defense counsel asked:

Q. I didn't just show you my hands. I described and pointed to what I was talking about when we were together earlier, didn't I?

A. You did.

Q. And so it wasn't just . . . showing you my hands. I pointed and described web, back of hand, opposite of palm, and you said 'yes,' correct?

A. Back of hand, not the web.

Q. Back of the web up here. That is what we were talking about. We were looking at both hands, and I was pointing to it. You looked at me, and you said 'Yes, that's correct'?

A. Well, not the web of the hands.

Q. No. No. What I am saying is, we stood here . . . and I showed you my hands, and I pointed to an area, and you said I was correct; isn't that right?

A. That's correct.

Q. All right. So, we can call it anything we want, but we have actually demonstrated what we are talking about, didn't we?

A. I have demonstrated what I was talking about.

On redirect, the prosecutor asked:

Q. Now, when [defense counsel] ... used his hand to demonstrate the web area between the thumb and the finger, did you intend to agree with [him] that that is where you saw what you believed was blood spatter?

A. No.

The prosecutor then read to Lintemoot the reporter's transcript of her testimony on the disputed videotape and asked:

Q. Do you recall that question-and-answer series?

A. Yes, I do.

Q. And that is consistent with what you have now clarified for us, if there was any confusion, correct?

A. That's correct.

This immediate cross-examination then followed:

Q. Didn't you just tell it was on the middle of the back of her hand?

A. Not the hand, the wrist.

Q. The wrist. Well, so what's exterior or outside?

A. Exterior is another way of saying outside. So, exterior, outside, posterior.

Q. The spatter was outside of the wrist, correct?

A. On the outside, the outside wrist.

Q. And you have no photos of it?

A. No.

Subsequently, defense counsel asked Dr. Lakshmanan, the coroner, about a meeting he had attended with members of the district attorney's office to discuss concerns about the case, one of which was Lintemoot's failure in her typed report to describe the exact location of the blood swabs she had taken from Clarkson's wrists. Lakshmanan testified that when he asked Lintemoot about this, she simply read him the notes she had taken at the crime scene. The prosecution then played the contested videotape of Lintemoot's testimony at the first trial, in which she described where she had seen the blood spatter. Lakshmanan testified this videotape would be the best guide to what Lintemoot had actually seen.

(Lodgment No. 10 at 27–31).[4]

**b. Additional Relevant Facts**

Petitioner maintains that the following facts, none of which were included in the court of appeal's opinion, are also relevant to his claims of constitutional error in Grounds One and Two.

At trial, petitioner called Werner Spitz, a forensic pathologist, to testify in his defense. Spitz opined that Clarkson committed suicide. (Lodgment No. 10 at 22). When cross-examining Spitz, the prosecutor played the videotape from the evidentiary hearing in petitioner's first trial. (Reporter's Transcript ["RT"] 6621).[5] After having done so, the prosecutor asked Spitz where Lintemoot had indicated that she had seen blood spatter on Clarkson's wrist. Spitz answered, "She said she saw it on the—on the back of the hand, on the area of the thumb. On the side of the thumb; that's what I thought she saw." (*Id.*). Believing that this testimony conflicted with what was said and depicted in

4. A copy of the videotape capturing the relevant portion of the evidentiary hearing from the first trial has been lodged with the Court. (Lodgment No. 3). Moreover, the Court has viewed the videotape.

5. Over defense counsel's relevance objection, the prosecutor initially played the video during the testimony of coroner Lakshmanan concerning his understanding of what Lintemoot meant when she referred to various parts of her wrist. (RT 6309–19).

the video, the prosecutor replayed the relevant portion of the video several times, stopping and starting the video to show where Lintemoot had indicated that she had seen blood. (*Id.* at 6622–24). This portion of the tape included the trial judge's description of where Lintemoot had pointed in answering the prosecutor's question.

Defense counsel objected to the use of the videotape, arguing that where Lintemoot had pointed was a disputed issue and that the use of the videotape effectively made the trial judge a witness in resolving the dispute. Specifically, defense counsel stated: "[The video] draws you into the case as a witness because [Lintemoot] started over here, and then you point like this and then she went like that." (RT 6624). The trial judge, however, overruled the objection, stating, "[The video] speaks for itself. It speaks for itself in front of the jury, and I don't agree with your interpretation of what I was doing. . . ." (RT 6625). This discussion was conducted outside the presence of the jury. (*Id.*).

The prosecutor then played the video again and then asked Sptiz, "D[o] you see where the court is pointing after Jamie Lintemoot indicates where she saw it where the court is pointing and making a record for the first trial?" (*Id.* at 6625). Spitz replied that he had seen the video, and in his opinion Lintemoot had pointed "to the radius here, and the ulna here . . . almost half of the back of the hand." (*Id.* at 6625). The prosecutor then played the video once more and, indicating where his watch was located, asked Spitz whether the video showed Lintemoot pointing to the back of her wrist. (*Id.* at 6626). Spitz replied, "I don't think it would be accurate based on what the video shows." (RT 6627).

Later in the trial, defense counsel moved to strike Lintemoot's testimony that she had seen blood spatter on the exterior of Clarkson's wrist. (*Id.* at 7879). In doing so, defense counsel argued that Lintemoot lacked sufficient expertise to testify whether what she saw was, indeed, blood spatter. (*Id.*). Defense counsel also moved to exclude any expert testimony regarding whether Clarkson could have fired the fatal shot, to the extent that the given expert's testimony was premised on Lintemoot's testimony that she had seen blood spatter on the exterior of Clarkson's wrist. (*Id.*). Additionally, defense counsel argued that, in the videotape of the evidentiary hearing from the first trial, there was confusion as to where Lintemoot was pointing and that the confusion was, in defense counsel's view, exacerbated by the trial judge's description of where Lintemoot was pointing. (*Id.* at 7883). Defense counsel further questioned why the trial judge had offered any description of Lintemoot's movements. (*Id.*).

The trial judge overruled defense counsel's objection. (*Id.*). In explaining his basis for making a record of where Lintemoot was pointing, the trial judge stated that his actions were appropriate because he had the best view of Lintemoot's movements and because no one else in the courtroom could see where Lintemoot was pointing: "I had the best view in the courtroom. I'm looking down at the witness . . . Everybody else—she didn't show it where the jury can see the top. The lawyers can't even see it. The only person who could see it is me, and I'm describing what I'm watching." [6] (*Id.*).

Undeterred by the trial judge's ruling, defense counsel again objected at the close of evidence to the admissibility of the vid-

6. Although the trial judge stated that the jury could not see to which area of her wrist Lintemoot was gesturing, the jury was not present when Lintemoot testified at the evidentiary hearing.

eotape. (*Id.* at 9140). This time, however, defense counsel argued, among other things, that the videotape violated petitioner's right to confrontation because it contained the trial judge's testimony on a contested issue that was offered without affording petitioner an opportunity to cross-examine the trial judge. Specifically, defense counsel stated:

> If you do that in this trial, then we have an opportunity to cross-examine it by saying[,] "Wait. Excuse me. That is not what the witness did, Your Honor. Let us show you what the witness did. Let us go back to the witness," and *et cetera.* [¶] By taking a clip from a previous trial, we are denied the right to cross-examine or to correct the record. I know it rarely happens, but the court could be wrong, and the court may have missed something, and I think that if the testimony had come in this proceeding, we would have the right to cross-examine in this proceeding. We didn't....

(*Id.* at 9142–43). Again, the trial judge overruled defense counsel's objection. (*Id.* at 9144).

During closing arguments, the prosecutor argued that Lintemoot's testimony as to where she had seen the blood spatter on Clarkson's wrist "absolutely prove[d] that [Clarkson] could not have held [the] gun." (*Id.* at 9264–65). The prosecutor then played the videotape from the evidentiary hearing and declared that, in the video, "Jaime Lintemoot clearly explains where the back spatter is." (*Id.* at 9275). The prosecutor punctuated this declaration by noting that the video showed both Lintemoot and the trial judge indicating that "the back spatter was on [Clarkson's] wrist on the outside, at the joint, a two or three inch radius." (*Id.* at 9275). The prosecutor then replayed the videotape and, again, noted that the trial judge had stated in the video that Lintemoot had pointed to the backside of her wrist:

> [J]ust so we are clear, let's go through it in slow motion. She is pointing to the backside of the wrist at the joint area, just like she's consistently testified. Now, the judge who had the best position, seated next to the witness, looks over to what she's done in that videotape, and then he describes it both by words and by his own demonstration, and this is what he did. So, when [defense counsel] gets up here and tries to argue to you that it wasn't here and that it's here, remember this videotape because then he's going to be telling you you can't believe your own eyes.

(*Id.* at 9295). In summing up this line of argument, the prosecutor stated that "this is the single piece of evidence [that the defense] cannot explain away. It is absolutely inconclusive with Lana Clarkson holding the gun." (*Id.* at 9297).

### 3. Federal Law and Analysis
#### a. Right to Impartial Judge

■ The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *Lang v. Callahan,* 788 F.2d 1416, 1418 (9th Cir.1986). The trial court " 'must be ever mindful of the sensitive role [the court] plays in a jury trial and avoid even the appearance of advocacy or partiality.' " *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 709 (9th Cir.1989) (quoting *United States v. Harris,* 501 F.2d 1, 10 (9th Cir.1974)).

■ Nevertheless, the standard for reversing a verdict because of judicial misconduct during trial is stringent. To sustain such a claim there must be "an 'extremely high level of interference' by the trial judge which creates 'a pervasive climate of partiality and unfairness.' " *Duckett v. Godinez,* 67 F.3d 734, 740 (9th

Cir.1995) (citation omitted); *see also United States v. Laurins*, 857 F.2d 529, 537 (9th Cir.1988) ("A judge's participation [in the trial] justifies a new trial only if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality."). On federal habeas review, the reviewing court must determine not simply whether the state trial judge committed judicial misconduct, but rather whether the "judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett*, 67 F.3d at 740.

■ In making this determination, courts must recognize that a trial judge is "more than an umpire." *Id.* at 739. Indeed, a trial judge has broad authority to explain and comment on the evidence at trial. *Quercia v. United States*, 289 U.S. 466, 469–70, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321 (1933); *see United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir.2001) (stating that trial judge may "'participate in the examination of witnesses to clarify issues and call the jury's attention to important evidence'") (citation omitted). This authority, however, is not boundless. *Quercia*, 289 U.S. at 470–72, 53 S.Ct. 698. For example, when a trial judge draws the jury's attention to the parts of the evidence he or she thinks are important or expresses an opinion as to a witness's credibility, the judge must make it "clear to the jury that all matters of fact are submitted to [its] determination." *Id.* at 469, 53 S.Ct. 698, 698–99.

■ Moreover, in commenting on the evidence adduced at trial, the judge may not assume the role of a witness. *Quercia*, 289 U.S. at 470, 53 S.Ct. 698; *see also In re Murchison* 349 U.S. at 137–38, 75 S.Ct.

623 (finding bias where judge, who initially acted as one-man grand jury in secret hearings that resulted in two witnesses being charged with contempt, later presided over witnesses' contempt hearings); *Brown v. Lynaugh*, 843 F.2d 849, 849–51 (5th Cir.1988) (holding that petitioner was denied right to due process where judge presiding over criminal case during which defendant escaped custody later presided over, and served as witness in, subsequent trial in which defendant was charged with escaping from custody).

■ Furthermore, although the judge is empowered to "analyze and dissect the evidence," he "may not either distort it or add to it." *Id.* at 470, 53 S.Ct. 698, 698–99. In *Quercia*, the trial judge breached the boundary between the permissible and the impermissible by, among other things, informing the jury that "'wiping' one's hands while testifying was 'almost always an indication of lying'" and by stating that he believed that "'every single word'" the defendant had said was "'a lie,'" except when the defendant had agreed with the government's testimony. 289 U.S. at 468, 53 S.Ct. 698. The trial judge, according to the Supreme Court, violated the defendant's right to due process because the trial judge did not simply "review the evidence to assist the jury in reaching the truth," but, rather, "in a sweeping denunciation[,] repudiated as a lie all that the accused had said in his own behalf...." *Id.* at 468, 53 S.Ct. 698, 698–99.

In determining whether a trial court's comments violate *Quercia's* prohibition on a trial judge's adding to or distorting the testimony of a witness, the First Circuit's opinion in *United States v. Paiva*, 892 F.2d 148 (1st Cir.1989), and the Sixth Circuit's opinion in *United States v. Pritchett*, 699 F.2d 317 (6th Cir.1983), are instructive.[7]

---

**7.** The Court is, of course, aware that, for purposes of AEDPA, only the Supreme

Court's holdings are binding on the state courts and only those holdings need be rea-

In *Paiva,* the trial judge in a cocaine distribution case exceeded his judicial role by explaining how the police use "field tests" to determine the presence of drugs. 892 F.2d at 158 n. 7. No witness testimony, other than the trial court's statements, was offered to explain what a field test was, nor was any witness testimony offered to establish that the police had used a field test to determine the nature of the substance of which the defendant was found in possession. *Id.* at 159. In holding that the judge exceeded his authority, the First Circuit explained that the judge's comment "was not merely summarization or comment on testimony," but rather new evidence to which no other witness had testified. *Id.*

Similarly, in *Pritchett,* the trial judge impermissibly added to the evidence after the prosecution was unable to establish that an individual was a convicted cocaine dealer. 699 F.2d at 318–19. Noting the prosecutor's inability to establish the point, the presiding judge remarked to the jury that he, himself, had sentenced the individual in question. *Id.* at 319. The reviewing court characterized the judge's remark as "improper testimony" because it "confirmed what the prosecutor had unsuccessfully attempted to solicit" from the defendant himself. *Id.* at 320.

By contrast, the Tenth Circuit's opinion in *United States v. Jaynes,* 75 F.3d 1493 (10th Cir.1996), illustrates a trial judge's permissible commentary on evidence. There, the defendant stood trial for forging her deceased grandmother's name on checks made payable to her grandmother. *Id.* at 1497–98. When cross-examining a government agent about two endorsements that appeared on the checks, defense counsel attempted to elicit an admission that the manner of the endorsements suggested that the defendant believed in good faith that she had the authority to sign her grandmother's signature. *Id.* at 1503. The prosecution objected to this line of questioning as intruding upon the jury's province. *Id.* In response, the trial court told the jury that the checks appeared to contain two endorsements, one by the defendant and one by her deceased grandmother. *Id.* The trial court noted that the endorsements appeared to have been made so that the checks could be properly deposited in the defendant's account. *Id.* The trial court then instructed the jury that it was free to conclude whether the endorsements suggested that the defendant intended to defraud by forging her grandmother's signature or whether she had signed both names mistakenly believing she was authorized to do so as her grandmother's agent. *Id.* On these facts, the Tenth Circuit, applying *Quercia,* held that the trial judge's "comments on the evidence were well within the bounds of propriety." *Jaynes,* 75 F.3d at 1503.

Here, the trial judge's comments were, likewise, permissible. Unlike the judges in *Paiva* and *Pritchett,* both of whom introduced facts into evidence to which no witness had testified, the trial judge here commented only on facts as to which Lintemoot had just testified. Indeed, the trial judge's comments merely stated for the record the part of Lintemoot's wrist to which she was pointing as she described where she saw the blood spatter on Clarkson's wrist. This practice of making a record of a witness's descriptive gestures is common throughout American courtrooms.[8] More importantly, this

sonably applied. *Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

8. *See, e.g., Aslam v. Mukasey,* 537 F.3d 110, 113 (3d Cir.2008) (judge stating for record that witness had identified defendant); *United States v. Johnson,* 519 F.3d 816, 818–19 (judge noting for record that witness was sobbing); *United States v. Jackson,* 688 F.2d 1121, 1123 (7th Cir.1982) (judge noting for record that witness identified defendant); *Kelly v. Small,* 2006 WL 7284010, at *17

practice has never been held by the Supreme Court to violate the rule of *Quercia*, or any other constitutional right to which a criminal defendant is entitled. Consequently, the court of appeal's rejection of this claim of constitutional error could not have been an unreasonable application of clearly established federal law as determined by the Supreme Court. *See Lopez v. Smith,* — U.S. —, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014); *Carey v. Musladin,* 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (where Supreme Court precedent gives no clear answer to question presented, "it cannot be said that the state court 'unreasonab[ly] appli[ed] ·clearly established Federal law' ").

Furthermore, despite petitioner's efforts to argue to the contrary, this case is readily distinguishable from *Quercia*. Indeed, the trial judge's statements here do not approximate the statements that the Supreme Court condemned in *Quercia* Whereas the trial judge in *Quercia* labeled as "lies" the entirety of the accused's testimony, the trial judge here stated nothing regarding the credibility of any witness. Rather, the judge simply stated for the record his neutral observations as to where Lintemoot pointed while testifying.

Moreover, the trial judge made clear to the jury that where Lintemoot was pointing during her evidentiary hearing testimony was a matter of fact for the jury to determine. In his final instructions to the jury, the trial judge specifically instructed the jurors that they, and they alone, were to decide "what the facts [were] in this

case." (RT 9658). There is no reason to believe that the jurors would interpret this instruction as being inapplicable to the question of where in the videotape Lintemoot pointed while testifying. On the contrary, the testimony following the jury's viewing of the videotape shows that disagreements as to where Lintemoot was pointing were permissible. For example, when the prosecutor questioned Spitz as to where Lintemoot had pointed in the video, Spitz disagreed with the videotaped observations of the trial judge. Further, as is evident from the videotape itself (Lodgment No. 3), a person viewing the tape would have no trouble seeing precisely where Lintemoot was pointing as she described where she saw the blood spatter. Given these facts, no reasonable juror would feel bound to accept as gospel the trial judge's observations as to Lintemoot's hand gestures.

More importantly, the fundamental premise of petitioner's claim is flawed. Petitioner maintains that the trial judge "took sides in a hotly contested issue of forensic evidence." (Pet., Points & Auth. at 40). Presumably, that "hotly contested issue" was whether Lintemoot saw blood spatter on the exterior of Clarkson's wrist. (*See id.* at 45–46 ("In the videotape, the trial judge asserted—both through oral statements and assertive gestures—that Lintemoot saw blood on the back of Ms. Clarkson's wrists.")). But, in fact, the trial judge neither said nor did anything that could be construed as a comment on that "hotly contested issue." Instead, the trial

(C.D.Cal. Aug. 21, 2006) (judge ordered that record reflect that defendant had refused to answer question and that he had previously refused to answer question); *Gaston v. Brigano,* 2004 WL 5349214, at *15 (S.D.Ohio Nov. 19, 2004) (judge ordering record to "reflect that the witness nodded her head in an affirmative manner"); *United States v. Marcus Schloss & Co.,* 1989 WL 153353, at *4 (S.D.N.Y. Dec. 11, 1989) (judge noting that

witness had rotated his head "[i]n the direction 'or the general vicinity of his left temple," but leaving it for jury decide); *State v. Spencer,* 2015 WL 134234, at *16 (Ohio App.3d Dist Jan. 12, 2015) (judge stating for record that "witness was pointing to her mouth"); *State v. Kiese,* 126 Hawai'i 494, 502, 273 P.3d 1180 (2012) (court ordering record to reflect that witness nodded head).

judge commented only on where Lintemoot was pointing as she was testifying. That fact was not a hotly contested issue. Although Spitz disagreed with the trial judge's observations, that disagreement is of little consequence because Lintemoot herself immediately confirmed the trial judge's observations when the trial judge asked her to clarify where she saw the blood spatter. And, as explained above, Lintemoot's gestures are clearly captured in the videotape. (See Lodgment No. 3).

Regardless, even assuming error, petitioner suffered no cognizable prejudice as a result. The crux of petitioner's claim is that the trial judge testified regarding where Lintemoot had pointed during the evidentiary hearing. But petitioner ignores the fact that the trial judge let Lintemoot have the final say as to where she saw the blood spatter. Indeed, rather than simply relying on his own observations, the trial judge asked Lintemoot to resolve the issue. Subsequently, at the retrial, Lintemoot again testified that she saw blood spatter on the exterior of Clarkson's wrist—in other words, she twice testified to the very facts that petitioner contends were supplied by the trial judge. And, as explained above, the video clearly shows where Lintemoot was pointing; thus, there is no reason to believe that a juror would have accepted the judge's observations if the juror disagreed with those observations.

Furthermore, contrary to petitioner's contentions, nothing that the trial judge said or did in the videotape realistically could be construed as rehabilitating Lintemoot's testimony. The primary questions insofar as Lintemoot's testimony regarding where she saw the blood spatter were these: (1) did she actually see it and (2) was she qualified to distinguish blood spatter from blood transfer. (See Pet., Points & Auth. at 66 (conceding that question of whether there was blood spatter on back

of Clarkson's wrist "was wholly dependent on" Lintemoot's testimony "concerning the location of blood")). By noting where Lintemoot had pointed in the courtroom, the trial judge did nothing that could have swayed the jury's opinion as to either question. Moreover, the trial judge explicitly instructed the jury not take anything he said or did as an indication of what he thought of the facts or the witnesses. (RT 9689). Consequently, petitioner's argument that the trial judge's actions somehow rehabilitated Lintemoot's testimony is meritless.

Additionally, nothing that the trial judge said or did prevented defense counsel from attacking Lintemoot's credibility as to whether she saw blood transfer on the exterior of Clarkson's hand or as to whether she could distinguish blood spatter from transfer. And, as the record demonstrates, defense counsel, indeed, attacked Lintemoot's credibility on both counts. For example, at one point, defense counsel was able to get Lintemoot to testify that, in fact, the blood spatter she saw on Clarkson's hand was located in a spot other than the one that she had previously identified at the evidentiary hearing. (Lodgment No. 10 at 29). Defense counsel also elicited testimony that people within the district attorney's office had criticized Lintemoot's report about the crime scene for its lack of detail regarding the description of the blood on Clarkson. (RT 6293–94). Moreover, none of the pictures that were taken of Clarkson at the crime scene corroborated Lintemoot's testimony regarding where she had seen the blood spatter. (Id. at 3266, 3292). Lintemoot also readily admitted that she could not tell the difference between blood spatter and blood transfer and flatly conceded that she could not interpret blood spatter. (Id. at 3294–95). Put simply, Lintemoot's testimony as to where and whether she saw blood spatter on Clarkson's wrist was subject to attacks

on multiple fronts. Nothing that the trial judge did or said shielded her from the onslaught of those attacks.

Finally there is no merit to petitioner's argument that the trial judge erred in allowing stills from the videotape to be used during closing argument or in neglecting to instruct the jury that the judge was not a witness.[9] As to the former, the trial judge did not err because, as explained above, the videotape was properly admitted into evidence. Although some of the stills depicted the trial judge, the stills showed nothing that the jury had not already seen. And, as explained above, the stills did not indicate whether or where Lintemoot saw the blood; rather, they showed only where the trial judge had seen Lintemoot point during her testimony. Given this fact, there is no reasonable likelihood that the jury would have considered the trial judge a witness. Consequently, no jury instruction on that issue was necessary. Even accepting petitioner's argument that the judge's decision against giving such an instruction was erroneous, petitioner could not have suffered prejudice for the many reasons set forth above—not the least of which were that the video clearly showed where Lintemoot pointed while testifying at the hearing and that the judge had Lintemoot clarify her testimony as to where she was pointing. (*See supra*).

In sum, the trial judge did not act a witness for the prosecution, nor did the judge violate any constitutional right to which petitioner was entitled by making a record of Lintemoot's hand gestures. Moreover, even assuming error, petitioner has failed to show that the purported error rendered his trial so fundamentally unfair as to violate federal due process under the United States Constitution. Accordingly, the court of appeal's rejection of this ground for relief was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court.

#### b. Confrontation Clause

■ The Confrontation Clause of the Sixth Amendment, made applicable to state criminal prosecutions through the Fourteenth Amendment, provides that the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54, 124 S.Ct. 1354. The Confrontation Clause does not, however, "bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59, 124 S.Ct. 1354 n. 9.

■ Here, there is no merit to petitioner's claim that the trial judge's statements captured in the videotape violated

---

9. Respondent contends that petitioner's argument regarding the prosecutor's use of the stills from the videotape is procedurally barred because the court of appeal cited petitioner's failure to properly raise this argument in his direct appeal as a basis for rejecting it. (Answer at 12). The Court, however, elects to address this argument because, as petitioner concedes, it is not an independent ground for relief, but rather only offered as evidence of the purported prejudicial impact of the trial judge's alleged error in allowing the prosecutor to show the videotape to the jury. (*See* Reply at 11–12). Moreover, even if the argument constituted an independent ground for relief, the Court would elect to consider and reject it, rather than determine if it is procedurally barred, because it is a meritless ground for relief. *See Lambrix*, 520 U.S. at 524–25, 117 S.Ct. 1517 *(supra)*.

petitioner's Sixth Amendment right to confrontation. First, the court of appeal reasonably concluded that the trial judge's statements at the evidentiary hearing were admissible for a non-hearsay purpose—namely, to clarify and give context to Lintemoot's testimony as to where she saw the blood spatter. Although petitioner maintains that construing otherwise inadmissible testimonial statements as being admissible to give context to other testimony effectively renders *Crawford* a dead letter, the Court sees no such danger in this case. The trial judge's statements here were not directed at any contested fact, nor did they involve facts underlying the actual crime for which petitioner stood trial. Rather, they served only to record where the witness was gesturing as she testified. Recognizing the non-hearsay purpose of providing context in such circumstances is not likely to be the death knell of *Crawford.* Moreover, in any event, the Supreme Court has never held that the Confrontation Clause prohibits a trial court from making a record of the contemporaneous physical gestures of a testifying witness. Given this lack of Supreme Court authority, the court of appeal's rejection of petitioner's Confrontation Clause claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court. *See Lopez,* 135 S.Ct. at 4 *(supra).*

Second, even if the trial judge's statements served no non-hearsay purpose, petitioner nevertheless would not be entitled to relief because he was afforded an opportunity to contest the trial judge's observations. The trial judge made his supposedly offending statements in open court, in the presence of counsel. Had defense counsel, in that proceeding, believed that the trial judge's observations were erroneous, counsel was free to object to the judge's findings, inquire as to the judge's ability to see Lintemoot's hand gestures,

or question Lintemoot further as to where she was pointing when describing the blood spatter that she claimed to have seen on Clarkson's wrist. To be sure, counsel did not object, inquire of the judge regarding his ability to see, or question Lintemoot on this point. Notwithstanding that fact, counsel had the opportunity to do so. In analogous situations, courts routinely reject Confrontation Clause challenges. *See, e.g., Glenn v. Dallman,* 635 F.2d 1183, 1186–1187 (6th Cir.1980) (finding eyewitness's identification testimony at preliminary hearing admissible against defendant at trial even though defendant declined to thoroughly cross-examine witness); *United States v. Zurosky,* 614 F.2d 779, 791–93 (1st Cir.1979) (same).

Third, assuming that the trial judge's statements violated the Confrontation Clause, habeas relief still would be unwarranted because the purported error could not have had a "substantial and injurious effect or influence in determining the jury's verdict" or the trial proceedings. *See Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (setting forth harmless error standard applicable to criminal trial constitutional errors); *see also Ocampo v. Vail,* 649 F.3d 1098, 1114 (9th Cir.2011) (noting that Confrontation Clause claims are subject to harmless error standard set forth in *Brecht).* At bottom, petitioner contends that he was denied an opportunity to cross-examine the trial judge as to where the judge saw Lintemoot point while testifying. Petitioner, however, does not even attempt to explain how cross-examination on this point would have been beneficial to his case. It is, moreover, difficult to see how petitioner could have undermined the reliability of the trial judge's observations, considering that the judge was making a contemporaneous observation of Lintemoot's actions for the trial record. Fur-

ther, even if petitioner somehow could have undermined the trial judge's observations, doing so would have achieved little because Lintemoot herself testified that the blood spatter she had seen on Clarkson's wrist was located on the exterior of her hand. And, as explained above, the videotape clearly showed where Lintemoot pointed as she testified. Finally, as explained above, where the trial judge witnessed Lintemoot pointing was not a hotly contested issue: whether Lintemoot actually saw blood spatter on the exterior of Clarkson's hand and whether she properly categorized it as blood spatter—as opposed to blood transfer—were hotly contested issues. Nothing the trial judge said or did, however, had any impact on either of those issues. Consequently, the trial judge's statements could not have had a substantial and injurious impact on the jury's verdict.

For the foregoing reasons, the court of appeal's rejection of petitioner's Confrontation Clause claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d).

## GROUNDS THREE AND FOUR: PROSECUTORIAL MISCONDUCT

In his third and fourth grounds for relief, petitioner contends that the prosecutor committed several acts of misconduct that deprived petitioner of his right to due process and a fair trial.

Allegations of prosecutorial misconduct are governed by the standard set forth by the Supreme Court in *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *see Parker v. Matthews,* —— U.S. ——, 132 S.Ct. 2148, 2155, 183 L.Ed.2d 32 (2012) *(per curiam)* (identifying *Darden* as "[t]he 'clearly established Federal law' " relevant to claims of prosecutorial misconduct arising from prosecutor's closing arguments). In *Dar-*

*den,* the Supreme Court explained that prosecutorial misconduct does not rise to the level of a constitutional violation unless it " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden,* 477 U.S. at 181, 106 S.Ct. 2464 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)); *Comer v. Schriro,* 480 F.3d 960, 988 (9th Cir.2007). To determine whether a prosecutor's comments amount to a due process violation, the reviewing court must examine the entire proceedings so that the prosecutor's remarks may be placed in their proper context. *Boyde v. California,* 494 U.S. 370, 384–85, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

In making this determination, the reviewing court must be mindful that the standard set forth in *Darden* is a "very general one." *Parker,* 132 S.Ct. at 2155. Consequently, it "leav[es] courts more leeway ... in reaching outcomes in case-by-case determinations." *Id.* (citations and internal quotations omitted). Thus, to establish that a state court's application of the *Darden* standard is unreasonable, the petitioner must show that the state's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker,* 132 S.Ct. at 2155. Assuming, however, that a petitioner can establish that the prosecutor engaged in misconduct, habeas relief nevertheless is unwarranted unless the petitioner can show that the misconduct had a substantial and injurious impact on the jury's verdict. *Karis v. Calderon,* 283 F.3d 1117, 1128 (9th Cir. 2002) (citing *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710).

Here, neither of petitioner's allegations of prosecutorial misconduct warrants fed-

eral habeas relief. Each allegation is addressed in turn below.

### 1. Arguing That the Trial Judge Was a Prosecution Witness

In his first allegation of prosecutorial misconduct, petitioner faults the prosecutor for arguing that the trial judge was a witness for the prosecution and for urging the jury to rely on the trial judge's observations as evidence of petitioner's guilt. Specifically, petitioner asserts that the prosecutor argued that the trial judge was a "key witness" on one of the most hotly contested issues during trial—namely, whether there was blood spatter on the back of Clarkson's wrist. (Petition, Points & Auth. at 54). In doing so, according to petitioner, the prosecutor conveyed to the jury that he and the trial judge were aligned against petitioner. Petitioner also faults the prosecutor for using stills from the videotape depicting the trial judge to argue that the scientific evidence debunked petitioner's defense. Petitioner maintains that the prosecutor's actions improperly "tipped the scales of justice" against petitioner and in favor of the State. (*Id.* at 56).

#### a. Factual Background

As discussed above, the trial judge allowed the prosecutor to introduce a videotape from the evidentiary hearing at petitioner's first trial in which the trial judge made a record as to where Lintemoot was pointing as she testified.

During closing argument, the prosecutor repeatedly referred to the videotape and noted that Lintemoot had testified as to where she had seen blood spatter on Clarkson's wrist. The prosecutor also noted that the trial judge had stated that Lintemoot had pointed to the back of her wrist in describing where she saw the blood spatter. Specifically, the prosecutor argued as follows:

[S]ee with your own eyes where she and the judge indicated the back spatter was on Lana's wrist on the outside, at the joint, a two or three inch radius. (RT 9275).

. . .

Now, the judge who had the best position, seated next to the witness, looks over to what she's done in that videotape, and then he describes it both by words and by his own demonstration, and this is what he did. (RT 9295).

. . .

This is where she was pointing to. This is where the court saw her pointing to. (RT 9609).

In making these comments, the prosecutor displayed stills from the videotape. Some of those stills depicted the trial judge.

#### b. Analysis

 The prosecutor's comments pertaining to the trial judge did not so infect petitioner's trial with unfairness as to make the resulting conviction a denial of due process. Taken in context, the prosecutor's statements were unlikely to have led any juror to believe that the trial judge was a witness for the State. Indeed, in two of the examples cited by petitioner, the prosecutor simply states that the trial judge described where he saw Lintemoot pointing while Lintemoot was testifying at the evidentiary hearing from the first trial. Based on this fact, and the fact that the jury saw the full video, the jury necessarily would have understood that the prosecutor's closing argument references to the trial judge pertained only to the judge's observations of Lintemoot's hand gestures at the evidentiary hearing—not to whether, in fact, Lintemoot saw blood spatter on the back of Clarkson's wrist. And, nothing about commenting on the trial judge's observations as to Lintemoot's hand gestures would have led a reasonable juror to conclude that the trial judge was somehow

aligned with the State. On the contrary, the trial judge's observations were neutral, in that they merely clarified for the record the physical movements of the witness. Consequently, commenting on the trial judge's neutral observations could not have deprived petitioner of his right to a fair trial.

Petitioner, however, suggests that the prosecutor nevertheless erred in commenting on the trial judge's videotaped comments because the judge, himself, made clear in the videotape that he wanted the record to reflect not his observations of Lintemoot's hand gestures, but rather Lintemoot's own testimony as to where she was pointing.[10] But even accepting petitioner's argument on this point, he nevertheless can show no prejudice. As explained in connection with petitioner's first ground for relief, the videotape clearly spoke for itself in terms of where Lintemoot gestured while testifying at the hearing. Without any adverse ramifications, at least one witness offered a view of Lintemoot's gestures that conflicted with that of the trial judge. Accordingly, the jury was well aware that the trial judge's observations were not dispositive in terms of establishing where Lintemoot had. pointed while testifying.

More importantly, where the trial judge observed Lintemoot pointing was not a contested issue that would have impacted the jury's verdict. Rather, as explained above, whether Lintemoot in fact saw blood spatter on the exterior of Clarkson's wrist was the issue that arguably impacted the jury's verdict. Furthermore, as explained earlier, Lintemoot's credibility regarding her testimony on this point was open to attack. (*See supra*). The jury's assessment of Lintemoot's credibility, however, could not have been materially affected by the prosecutor's references to the trial judge's in-court observations because nothing the judge said or did made Lintemoot's testimony more or less believable. Thus, by noting that the trial judge observed Lintemoot point to her own wrist, the prosecutor could not have impacted the jury's assessment of the evidence as to any material point in dispute.

Finally, there is no merit to petitioner's claim that the prosecutor committed misconduct in displaying stills from the videotaped evidentiary hearing. At bottom, the prosecutor showed the jury stills from a videotape that was properly introduced into evidence. (*See supra*). Consequently, the prosecutor could not have committed misconduct by displaying stills from that same video. Even assuming error, petitioner could not have suffered prejudice because the jury had already seen the video. Thus, no reason exists to believe that viewing stills from the properly-admitted video either deprived petitioner of his right to due process or substantially and injuriously impacted the jury's verdict.

Accordingly, petitioner is not entitled to habeas relief with respect to this ground.[11]

### 2. Attacking Defense Counsel's Integrity and Making Improper Arguments Regarding Petitioner's Wealth

In his second allegation of prosecutorial misconduct, petitioner asserts that the prosecutor deprived petitioner of his right

---

**10.** In particular, petitioner notes that, after commenting on Lintemoot's hand gestures, the trial judge asked Lintemoot to explain where she was pointing.

**11.** Again, the Court notes that there is no procedural bar to petitioner's argument regarding the prosecutor's supposed misconduct of arguing that the trial judge was a prosecution witness. However, even if that aspect of Ground Three were procedurally barred, the Court would have addressed it because it clearly fails even under *de novo* review for the reasons stated above.

to due process and a fair trial by impugning defense counsel's integrity. Specifically, petitioner faults the prosecutor for suggesting that defense counsel sought to "hide the truth" and that defense counsel suborned perjury by paying the defense experts large fees to tailor their testimony to benefit petitioner's case. Petitioner asserts that these inflammatory attacks had no basis in fact and, moreover, prejudiced the jury against both petitioner and his counsel. As a result of the prosecutor's inflammatory remarks, according to petitioner, the jurors reached their verdict based not on the evidence presented at trial, but rather upon their misguided beliefs regarding defense counsel's ethics and integrity.

### a. Factual Background

The primary issue in petitioner's second trial (as in the first trial) was whether or not Clarkson shot herself. The defense sought to show that Clarkson was suicidal and that she, herself, accidentally or intentionally inflicted the fatal shot. (Lodgment No. 10 at 24–26). For his part, the prosecutor presented expert testimony to show that Clarkson was not suicidal and that her death was a homicide, not a suicide. One such expert was Deputy Coroner Louis Pena, who opined that Clarkson had been murdered. (*Id.* at 11). On cross-examination, defense counsel sought to undermine that opinion. As part of his effort to do so, defense counsel questioned Dr. Pena as follows: "Would it make any difference in your assessment of Miss Clarkson's frame of mind if you knew that [less than two months before her death] she had written [an e-mail] to a friend, David Shapiro—'I am truly at the end of this whole deal. I'm going to tidy up my affairs, and chuck it because it's really all too much for just one girl?'" (*Id.* at 78).

In quoting Clarkson's email, defense counsel omitted the very next sentence, in which Clarkson had written, "Don't worry, not before I pay you back." (*Id.*). When questioning the actual recipient of Clarkson's email, the prosecutor read the entire quote aloud and asked the recipient about the quote. (*Id.*). The recipient stated that Clarkson's comments were merely examples of what he characterized as Clarkson's way of being overly dramatic. (*Id.*).

In addition to evidence pertaining to Clarkson's mental state, defense counsel presented expert scientific evidence to show that Clarkson had fired the shot that killed her. (*See id.* at 2124). Not surprisingly, the testimony of the defense experts directly contradicted the testimony of the State's experts as to whether the fatal shot was self-inflicted. (*Compare id.* at 11–14, *with id.* at 21–24). During the prosecutor's cross-examination of the defense's expert witnesses, the prosecutor elicited testimony regarding the amount of money that the defense had paid each expert in connection with the given expert's testimony and his or her review of the relevant materials. (*See, e.g.,* RT 7767–68).

During closing arguments, the prosecutor sought to discredit the defense's expert witnesses. In furtherance of that effort, the prosecutor made the following statement:

All told, the defense ended up, basically, changing everything. When it didn't work, they just changed it. If you can't change the facts, change the evidence. If you can't change the evidence, change the science, and if you can't change the science, folks, just go out and buy yourself a scientist. That may work. [¶] There may be some way to convince a jury ... of that. Don't let that happen. See this for what it was. This was a 'pay to say' defense. You pay it; I'll say it, no matter how ridiculous it is. I'll even say blood flies around corners. [¶] The total cost to the defense to hide the truth from you folks, a staggering $419,000. Cogitate on that number for

just a second. A staggering $419,000 bucks to hide the truth.
(RT 9605–06).

In response to this argument, defense counsel objected, arguing that the prosecutor had effectively accused defense counsel of paying for and presenting false testimony. (*Id.* at 9606). The trial judge overruled the objection, but nevertheless urged the prosecutor to make clear that her argument was directed at the credibility of the experts, as opposed to an attack on defense counsel's integrity. (*Id.* at 9606). When the prosecutor resumed her argument, she did so by urging the jury to take into account how much the experts were paid when assessing their credibility. Specifically, the prosecutor stated the following:

> The experts, generally on the defense side, said things helpful to the defense that do not, do not in any way, shape, form or fashion fit into the science in this case. You have to ask yourself why. You have to ask yourself why. [¶] Nobody cares that they are paid. Werner Spitz can make anything he wants. Like I said, he can make a million dollars or a dollar. I couldn't care less. What we are after is the truth. And you can use the amount of money that they were paid or that they were paid at all to determine how much credibility you are going to give them. That's what that figure means. How much credibility are you going to give the science experts when they have been paid this kind of money? That's what that number means.

(RT 9607).

The prosecutor also directed several statements at what she characterized as the defense's willingness to shift or obfuscate the truth. The following are examples of the prosecutor's remarks:

> In [petitioner's] world, you can commit such violence, such conscious disregard for human life not once but seven times. And when that violence finally catches up to you, you can write a check. You can write a check for $419,000 to hire paid-to-say witnesses to get you out of what you have done. (*Id.* at 9234).
>
> . . .
>
> Nothing that they have presented to you has been constant. Nothing that they have presented to you has been dependable. Their evidence is evidence of convenience. Their [defense] version of the truth shifts with whatever direction the wind blows. *Id.* at 9245.
>
> . . .
>
> Now, I expect [defense counsel] to get up here in argument and talk to you quite bit about Jaime Lintemoot. I expect [defense counsel] to do with this evidence what he's done with it all through the trial. Go through the machinations of the truth to avoid it, to change it, to move it from here to here. I mean, this is almost like an inside joke with us because we've seen this moved to here. [¶] But that is not where [defense counsel] started with Jaime Lintemoot. He's going to get up here and he's going to argue to you, you can't believe that back spatter was on the wrist because you can't rely on Jaime Lintemoot. But that is not where [defense counsel] started with Jaime Lintemoot. That is not where he said the hills would be at the beginning of this trial.[12] (*Id.* at 9276).

---

12. The prosecutor's reference to "hills" was part of a theme she used throughout her closing argument. Specifically, she analogized the defense's approach to the truth to a group of sand dunes in Vietnam. (*See* RT 9245). The hills of the sand dunes, according to the prosecutor, are ever-shifting depending on the elements. (*Id.*). In what was her first reference to the theme to which she continually returned, the prosecutor stated that "[t]he de-

... 

[B]ut let's go back to what [defense counsel] said in opening statement when he told you Jaime Lintemoot said there was spatter, so that means there was spatter. What did he tell you about that evidence. He told you [that] you could rely on that evidence to conclude that Lana Clarkson held the gun in an intraoral suicide. It's not good enough for a reasonable expert to rely on, but a lawyer can get up here and argue to you that that is proof she committed suicide, but the moment the evidence no longer suits their purpose, the truth, their version of the truth begins to shift. (*Id.* at 9296).

...

Now we've got blood looping over, traveling around corners, something that you have heard from every single expert in this case does not happen. Who else told you that blood does not travel around corners? That is [defense counsel] in his opening statement ... You will hear that from every scientist until we've got to throw a Hail Mary pass. Bring in Dr. Di Maio who said "Blood looping over and hitting the back of the hand." [¶] ... Why it is that the defense needs to go through this long process of machinations of truth on this? (*Id.* at 9296–97).

...

[Defense counsel] said my job is to give you possibilities. That's my job. I'm here just to give you possibilities just regale you with all kinds of possibilities. [¶] That's funny. My job, Ms. Do's [co-prosecutor] job, is to give you the truth

... [defense counsel] doesn't like the truth. He just moves it. (RT 9549–50).

...

The transcripts, how many times, as you sat in the jury box, did you hear somebody from the defense, [defense counsel], cross-examine somebody, a prosecution witness, and read a line—how many times after that line was read in cross-examination, did you think to yourself, I can't wait until either [of the prosecutors] stands back up and reads the rest of the story. [¶] It happened over and over and over. You kept hearing it in this courtroom; objection. That's out of context. Read the rest of the paragraph. [¶] When the truth doesn't suit the defense, just move the truth or mask the truth. (*Id.* at 9553).

...

Ultimately, what the defense science told you was that they are willing to say, when everything adds up to homicide, everything adds up, everything points to homicide, [the defense experts] are willing, for a price, folks, and wait till you get this price, they are willing to come in and say suicide. Can you believe Werner Spitz, when asked last year how much he made ... The fact of the matter is, he is a professional witness. He knows I'm going to find out how much money [he] made ... he knows I'm not stupid. I'm going to ask the question, and I'm going to find out one way or the other. Yet, when he is asked the simplest questions, he tries to hide the truth. (*Id.* at 9597–98).[13]

---

fense in this case, and what the truth means to them, reminds me of that place." (*Id.*). (Footnote added by Court).

13. Each of the foregoing examples was cited by petitioner in support of his prosecutorial misconduct claim. Notably, however, peti-

tioner quoted only snippets of the foregoing examples in support of his argument. (*See* Pet., Points & Auth. at 58). For its analysis, the Court has attempted to provide context to those snippets by including the statements of the prosecutor that either precede or follow the snippets that petitioner has cited.

### b. Court of Appeal Opinion

The court of appeal rejected petitioner's allegation of prosecutorial misconduct on its merits. In doing so, the court of appeal reasoned that "[t]he prosecutors did not accuse defense counsel of coaching witnesses or of believing that his client was guilty" and that "[a]t most, [the prosecutors] suggested that the 'defense team' may have sought an expert whose technical opinions would be favorable to [petitioner's] case." (Lodgment No. 10 at 77). The court of appeal then noted that "[a]n argumentative reminder that defense counsel may have chosen [a defense expert] for this reason is not equivalent to an insinuation that counsel suborned perjury or engaged in deception." (*Id.*). The court of appeal also found that "[t]he prosecutor's remarks were likely interpreted as 'an admonition not to be misled by the defense interpretation of the evidence, rather than as a personal attack on defense counsel.'" (*Id.* at 78 (citation omitted)).

The court concluded that the record, likewise, supported the "prosecution comments to the effect that the defense was adverse to the truth." (*Id.*). In particular, the court cited what it believed was defense counsel's attempt to quote Clarkson's email out of context while questioning Deputy Coroner Pena as an example of defense counsel's adversity to the truth. (*Id.*). The trial judge explained that defense counsel's framing of the question to Dr. Pena "could be grounds for arguing the defense was trying to hide the truth." (*Id.*).

### c. Analysis

 Counsel may not make arguments calculated to arouse the passions or prejudices of the jury. *Viereck v. United States*, 318 U.S. 236, 247–48, 63 S.Ct. 561, 566, 87 L.Ed. 734 (1943). Nevertheless, "counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253–54 (9th Cir.1996). This latitude extends to criticism of defense theories and tactics. *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir.1997). Indeed, "[a] lawyer is entitled to characterize an argument with an epithet as well as a rebuttal." *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir.1998).

The Supreme Court's opinion in *Parker* is instructive in terms of understanding the reasonableness of a state court's determination regarding whether a prosecutor has or has not exceeded the latitude afforded prosecutors in making closing arguments. In *Parker*, the petitioner sought habeas relief based on the prosecutor's comments in closing argument suggesting that the petitioner had colluded with his lawyer and a witness to manufacture an "extreme emotional disturbance" defense. 132 S.Ct. at 2154 n. 2. The prosecutor also labeled the petitioner's defense as "'the defense of last resort'" and stated that the petitioner pursued the emotional disturbance defense because it was "'his only way out.'" *Id.* at 2154–55. Although the prosecutor immediately disavowed any suggestion of collusion after making the offending comments, the petitioner nevertheless argued that the prosecutor's comments were prejudicial in that they aroused the passions of the jury and improperly impugned the integrity of both the petitioner and his counsel. *See id.* at 2153–54.

The Supreme Court held that the state court reasonably concluded that the prosecutor's comments did not violate the *Darden* standard. *Id.* at 2154–56. In so holding, the Supreme Court explained that the prosecutor's comments could have been understood as a permissible comment on

the petitioner's motive to exaggerate his emotional disturbance. *Id.* at 2155. Moreover, the Supreme Court stated that the state court's rejection of the claim would be reasonable even if the prosecutor's comments were "understood as directing the jury's attention to inappropriate consideration." *Id.* In support of this statement, the Supreme Court cited the "very general" standard set forth in *Darden* and concluded that the state's rejection of the petitioner's claim did not exceed the leeway afforded to the state in addressing such claims. *Id.*

 Here, the court of appeal, likewise, reasonably applied the *Darden* standard in rejecting petitioner's prosecutorial misconduct claim. First, the prosecutor committed no misconduct by arguing that the defense experts were not believable and that their testimony was influenced by the money they were paid. The latitude afforded to prosecutors in arguing reasonable inferences from the evidence extends to attacks on a witness's credibility *See Turner v. Marshall,* 63 F.3d 807, 818 (9th Cir.1995) (stating that prosecutor is permitted to go so far as to "label a witness's testimony as lies or fabrication") *overruled on other grounds by Tolbert v. Page,* 182 F.3d 677, 685 (9th Cir.1999) (*en banc*); *see also United States v. Laurins,* 857 F.2d 529, 539 (9th Cir.1988) (statement labeling defendant "a liar" could be construed as permissible comment on evidence); *United States v. Birges,* 723 F.2d 666, 672 (9th Cir.1984) (observing that it is "neither unusual nor improper for a prosecutor to voice doubt about the veracity of a defendant"). Thus, by arguing that the experts were lying or offering implausible opinions, the prosecutor committed no misconduct.

Although petitioner believes that the jury understood the prosecutor's comments as accusations that defense counsel or petitioner purchased false testimony, the challenged comments reasonably could have been understood as strongly-worded arguments that the defense experts were biased and that they were willing to lie for petitioner in order to secure their hourly fees. Such comments do not result in a due process violation. *See Duckett v. Mullin,* 306 F.3d 982, 989 (10th Cir.2002) (prosecutor did not violate petitioner's right to due process by arguing that defense expert reached opinion favorable to petitioner only because expert was paid to do so). The prosecutor's suggestions that the defense experts were lying, moreover, were arguably supported by the evidence at trial. Indeed, the prosecutor presented expert opinions that directly conflicted with those of the defense. Based on those facts, the prosecutor could permissibly argue that the State's experts testified in accordance with the facts of the case and that the defense experts did not.

 Second, the court of appeal reasonably concluded that the prosecutor did not violate petitioner's right to due process by suggesting that the defense was hostile to the truth. Although the prosecutor occasionally referred to defense counsel's purported aversion to the truth (or other words to that effect), there was, as the court of appeal noted, some evidence in the record to support those comments. Specifically, defense counsel misleadingly quoted one of Clarkson's emails in an effort to get one of the State's experts to concede that Clarkson was suicidal. (*See supra; see also* RT 9250–51 (noting that, in cross-examining eyewitness, defense counsel mischaracterized eyewitness account of facts immediately after murder by attributing state of fear to witness when witness testified that he was not in fear)). Accordingly, under *Parker,* the court of appeal could not have committed constitutional error in holding that the prosecutor's remarks about defense counsel were permissible.

Moreover, read in context, rather than in abstract isolation, the prosecutor's comments generally refer to contradictions in the theories and the evidence presented by the defense. (*See, e.g., id.* at 9257–58, 9261–62 (noting counsel's seemingly inconsistent approaches to establishing why eyewitness testimony regarding events occurring immediately after murder was not credible)). For example, during opening argument, defense counsel argued that the blood spatter noted in Lintemoot's crime reports would show that Clarkson killed herself. (*Id.* at 1242–43). But, at trial, when faced with testimony suggesting the opposite, counsel argued that the testimony regarding the blood spatter—particularly, that of Lintemoot—was unreliable. (*See supra*). Based on this apparent inconsistency, the prosecutor could permissibly argue that the defense was shifting the facts when it was convenient to do so. The same is true with regard to the prosecutor's statements as to the defense's evolving views on whether blood could loop or travel around corners. During opening statements, defense counsel ruled this out as a possibility (*id.* at 1240), but later presented an expert witness to opine that, in fact, it was possible. (*Id.* at 7806–08). Given these facts, the prosecutor was well within her authority to forcefully point out this patent contradiction. Additionally, many of the prosecutor's purportedly offending comments do not refer at all to defense counsel, but instead to the defense generally. (*See, e.g.,* RT 9245 ("Their [defense] version of the truth shifts ....); *id.* at 9296 ("[B]ut the moment the evidence no longer suits their purpose, the truth, their version of the truth begins to shift."); *id.* at 9297 ("Why does the "defense need[ ] to go through this long process of machinations of truth on this?"); *id.* at 9553 ("When the truth doesn't suit the defense, just move the truth or mask the truth.")). Because, taken as a whole, those arguments would necessarily be under-

stood as attacks on the defense's theories, tactics, and evidence, they were not only permissible, but represented precisely the type of "hard blows" that a prosecutor is permitted to make. *See Ceja,* 97 F.3d at 1253–54 (*supra*).

Regardless, even assuming that the comments that the prosecutor directed at defense counsel were impermissible, they nevertheless did not deprive petitioner of his right to a fair trial. At most, the prosecutor argued that defense counsel was adverse to the truth or that he was hiding the truth. While these comments may be condemnable and may be unbefitting of a prosecutor, they nevertheless are still less egregious than the type of statements that the Supreme Court has found to be insufficient to establish a due process violation based on prosecutorial misconduct. *See Darden,* 477 U.S. at 180 n. 10–12, 106 S.Ct. 2464 (prosecutor did not deprive defendant of right to fair trial where prosecutor urged jury to impose death penalty by arguing that "as far as I am concerned, ... [the defendant is] an animal," and "I wish [the decedent] had a shotgun in his hand ... and blown [the defendant's] face off. I wish that I could see him sitting here with no face, blown away by a shotgun").

The prosecutor's statements accusing defense counsel of being hostile to the truth are, likewise, less inflammatory than the prosecutor's statements in *Parker* suggesting that defense counsel and the petitioner had colluded with a witness to fabricate a defense. 132 S.Ct. at 2154–56. Because the statements in *Parker* were insufficient to establish a due process violation (*id.*), the prosecutor's comments here cannot support a successful due process claim, as those comments were less egregious than those at issue in *Parker.*

Petitioner, however, argues that *Parker* is readily distinguishable because, unlike

the prosecutor in petitioner's case, the prosecutor in *Parker* effectively cured his erroneous comments by disavowing any suggestion of collusion on defense counsel's part. The Court does not find this distinction persuasive. To be sure, petitioner is correct that the Supreme Court cited the prosecutor's disavowal of his suggestion of collusion as a basis for concluding that the prosecutor's comments were permissible. *Parker*, 132 S.Ct. at 2154–55. Notwithstanding that citation, the Supreme Court alternatively reasoned that the state court's rejection of the petitioner's prosecutorial claim would not have been an unreasonable application of *Darden* "even if the [prosecutor's] comment [was] understood as directing the jury's attention to inappropriate considerations." *Id.* at 2155. The same is true here.

██ Moreover, assuming error, there is no reason to believe that the prosecutor's comments regarding defense counsel had a substantial and injurious impact on the jury's verdict. Although petitioner argues that the prosecutor's comments served to inflame the jury's passion, the length of the jury's deliberations undercuts that argument. To be sure, lengthy deliberations often weigh against a finding of harmlessness. *See, e.g., United States v. Lopez*, 500 F.3d 840, 846 (9th Cir.2007). This, however, reflects the understanding that " 'lengthy deliberations suggest a difficult case.' " *Id.* (quoting *United States v. Velarde–Gomez*, 269 F.3d 1023, 1036 (9th Cir.2001) (*en banc*)). But here, the jurors' lengthy deliberations weigh in favor of a finding of harmlessness because the prolonged deliberations show that the jurors were unmoved by the prosecutor's comments. If, as petitioner posits, the prosecutor's comments truly inflamed the jurors' emotions and passions, the jurors would not have needed to deliberate for a lengthy period. But, in fact, the jurors deliberated for nearly thirty hours over a nine day period. Such prolonged delibera-

tions on the jurors' part do not suggest that the jurors were influenced by emotion or passion, but rather that they carefully and methodically approached their duty to assess and weigh the evidence in this matter. *See Walker v. Martel*, 709 F.3d 925, 943 (9th Cir.2013) (noting that thirty-five hour deliberations during which jury considered testimony of twenty-six witnesses demonstrated that "the jury carefully considered each of the charges"); *see also Gibson v. Clanon*, 633 F.2d 851, 855 (9th Cir.1981) (stating that fact that jury deliberated for nine hours over two and one-half days showed that jury seriously questioned the credibility of prosecution's eyewitnesses).

Finally, the trial judge's instructions blunted any potential prejudice stemming from the prosecutor's purportedly improper comments. For example, the jurors were instructed to decide the case based only on the evidence produced in court, with evidence defined as witness testimony, stipulations between the parties, and exhibits. (RT 9658). The jurors were also admonished that the lawyers' statements during opening and closing argument were not evidence and that the jurors were not to be "influenced by sympathy or prejudice." (*Id.*). More importantly, immediately before the prosecutor began his closing arguments, the trial court forcefully emphasized the fact that the arguments of counsel were not evidence, but rather an attempt on the part of counsel to persuade the jury:

> But it is also very important to remember that [counsels'] arguments are not evidence. The evidence is the sworn testimony that you heard from the witness stand, any stipulations that counsel entered into, and the physical exhibits that you will receive. That is evidence. [¶] The attorneys['] arguments are not evidence. It's an attempt to persuade you. There is a difference.... [¶]

Again, the attorneys' arguments are not evidence. Please keep that in mind. It is very, very, very, important for you to do so.

(*Id.* at 9232). Faced with similar facts, the Ninth Circuit has concluded that a prosecutor's use of "dehumanizing epithets," while objectionable and worthy of condemnation, did not deprive the petitioner of his right to a fair trial. *Comer,* 463 F.3d at 960–61 (noting that analogous admonishments and instructions "significantly limited any prejudice" caused by prosecutor's references to defendant as "monster" and "filth"); *see also Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) (noting that juries are presumed to follow instructions).

Accordingly, the court of appeal's rejection of this ground for relief was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court.

## VI

### *RECOMMENDATION*

It is recommended that the District Court issue an Order: (1) accepting this Report and Recommendation; and (2) directing that judgment be entered denying the Petition and dismissing this action with prejudice.

Dated: June 19, 2015